## In re TECHNOLOGY FOR ENERGY CORPORATION, Debtor.

### Bankruptcy No. 3-85-00455.

United States Bankruptcy Court, E.D. Tennessee.

Dec. 5, 1985.

Memorandum and Order Approving Debtor's Proposed Settlement With First American National Bank Dec. 19, 1985.

See also, 53 B.R. 32.

 

Robert Litz, Knoxville, Tenn., for ITT Indus. Credit Co.

Hunton & Williams, John A. Lucas, Jeffrey S. Norwood, Knoxville, Tenn., for Bechtel Const., Inc.

Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, John S. Hicks, Knoxville, Tenn., for Naxos Holding, B.V. and Norbert J. Ackermann.

Dearborn & Ewing, James R. Kelley, Nashville, Tenn., for the American Ins. Co.

Kennerly, Montgomery & Finley, G. Wendell Thomas, Jr., Knoxville, Tenn., for Energy Associates, Ltd.

House, Wallace, Nelson & Jewell, Mark W. Nichols, Little Rock, Ark., Lynn Tarpy, Knoxville, Tenn., for Arkansas Power & Light.

Snell & Wilmer, Peter J. Rathwell, Phoenix, Ariz., for Arizona Public Service, Palo Verde Nuclear Generating Station.

Richard Sedgley, Knoxville, Tenn., for the Creditors' Committee.

## MEMORANDUM AND ORDER ON DEBTOR'S PROPOSED SETTLEMENT WITH FIRST AMERICAN NATIONAL BANK

CLIVE W. BARE, Bankruptcy Judge.

Technology for Energy Corporation (TEC), the debtor-in-possession, and its principal lender, First American National Bank (FANB), seek approval of a settlement fixing the amount of FANB's secured claim and releasing FANB from all claims TEC may have against the bank, including claims: (1) to avoid preferential transfers; (2) to equitably subordinate FANB's claims; and (3) for damages resulting from alleged economic duress. Four of TEC's largest creditors and two shareholders object to the proposed settlement. The objectors contend the settlement improperly releases valuable claims TEC has against FANB; impermissibly values the FANB secured claim in an amount exceeding the value of the bank's collateral, 11 U.S.C.A. § 506(a) (1979); and that the settlement will render TEC insolvent, thus preventing

Martin & Cochran, G. Rhea Bucy, Thomas H. Forrester, Nashville, Tenn., for debtor.

Bass, Berry & Sims, John H. Bailey, III, L. Wearen Hughes, Mark Tipps, Nashville, Tenn., for First American Nat. Bank.

Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Craig J. Donaldson,

TEC from redeeming stock as proposed in its plan, since state law prohibits a corporation from redeeming its stock while insolvent. Tenn.Code Ann. § 48–1–513(d) (1984).

## I

In 1975 Norbert Ackermann, Jr., Julian Mott, and James Robinson founded TEC. During the next eight years TEC experienced dynamic growth in its business of designing, developing, and marketing computer based systems and instruments for use in the operation of nuclear and fossil fuel powered electric generating plants. Between 1980 and 1982 alone income from sales and engineering services nearly doubled, increasing from $9,309,000.00 to $18,-454,000.00.

TEC relied heavily upon borrowing to obtain working capital. In June 1983 TEC selected Park National Bank, FANB's predecessor, as its principal lender. Pursuant to a loan agreement dated July 14, 1983, and amendments thereto, TEC obtained the following prepetition loans from FANB or its predecessor:

| Loan Date | Loan Amount | Maturity Date of Note |
|---|---|---|
| 7/14/83 | $5,000,000[1] | 1/31/85 |
| 7/14/83 | $ 800,000 | 6/15/93 |
| 7/14/83 | $ 550,000 | 11/15/93 |
| 9/26/83 | $ 500,000* | 12/26/83 |
| 12/28/83 | $1,000,000 | 6/30/84 |
| 1/27/84 | $1,300,000 | 6/30/84 |
| 5/25/84 | $ 500,000* | Payable on Demand |
| 9/26/84 | $1,000,000 | 1/2/85 |
| 3/11/85 | $ 300,000[1] | Payable on Demand |

\* Paid in full

The FANB loans are secured by a security interest in TEC's accounts receivable, contract rights, contracts in progress, equipment, fixtures, furniture, furnishings, inventory, notes receivable, and patent rights. Financing statements have been filed to perfect the FANB interest.

For 1983 TEC forecast a profit exceeding $1,000,000.00 on projected sales of $23,000,-000.00. However, Ronald Brenner, Vice-President Finance and Secretary-Treasurer of TEC for over five years, testified that after mid-October 1983 he expected TEC to sustain a $1,000,000.00 loss for 1983.

TEC experienced three major setbacks in the final quarter of 1983: (1) TEC discovered it might incur a substantial loss on a contract with Bechtel Construction; (2) Houston Power and Light awarded a $20,-000,000.00 project TEC expected to receive to a competitor; and (3) the Clinch River Breeder Reactor project was cancelled. Bert Ackermann, chief executive officer and president of TEC from its inception until September 1984, informed FANB's chief executive officer of these setbacks. In December 1983 TEC formulated, and presented to FANB, a recovery plan based on a $1,500,000.00 equity investment, a $2,500,000.00 investment from E.F. Hutton through research and development limited partnerships, a $2,000,000.00 increase in the FANB credit line to TEC, renegotiation of the contract with Bechtel Construction, and recapture of prior income taxes in an amount of $700,000.00 or more based on the 1983 loss. According to Ackermann, FANB officials, though concerned, expressed confidence in TEC's recovery.

In March 1984 it became apparent that TEC's loss for 1983 was much greater than anticipated; its 1983 loss was not $1,000,-000.00 but $3,000,000.00. Also in March 1984, E.F. Hutton advised TEC the research and development limited partnership funds would not be forthcoming. As FANB officers became increasingly anxious about TEC's repayment ability, FANB demanded that TEC concentrate on finding a buyer. TEC retained E.F. Hutton to assist in a sale of the company. During June 1984, an offering memorandum prepared by TEC and E.F. Hutton was circulated, on a confidential basis, to approximately one hundred prospective buyers. Although Ackermann negotiated with six or seven interested parties, no offer was made to purchase TEC. Active efforts to sell TEC ceased in November 1984. Be-

1. These loans represent a revolving line of credit.

cause TEC had not met the projections in its offering memorandum and management needed to concentrate on recovery, FANB acquiesced in the cessation of efforts to sell TEC.

On March 29, 1985, TEC filed its chapter 11 petition. TEC's amended schedules, filed May 16, 1985, reflect indebtedness of $15,176,861.72, including secured debts totaling $11,421,781.71. The total value of the estate's assets is reportedly $7,812,-504.00.

## II

TEC reported an indebtedness to FANB of $10,047,394.31 in its schedules of creditors holding security. Undisputedly, FANB has a claim of approximately $9,900,000.00. The value of the collateral securing the FANB claim is disputed, but the proposed settlement and accompanying loan agreement provide that FANB shall receive: (1) a note in the principal amount of $6,000,000.00, secured by the same classes of TEC's property which secured the prepetition FANB loans and (2) a convertible subordinated note in the principal amount of $625,000.00 bearing interest at the rate of six percent per annum. FANB agrees to release such rights as it might otherwise have to TEC's cash.[2] FANB also relinquishes any right to a dividend on its unsecured claim of approximately $3,900,000.00. FANB further agrees to withdraw its objection to confirmation and vote to accept TEC's plan of reorganization. TEC agrees to forego all causes of action it may have against FANB.

Objections to the proposed settlement have been filed by four creditors: (1) Energy Associates, Ltd., TEC's former landlord; (2) Bechtel Construction, Inc.; (3) American

Insurance Co.; and (4) ITT Industrial Credit Co.[3] Objections have also been interposed by two TEC shareholders, Naxos Holdings, B.V. and Ackermann, the principal shareholder.[4] Insisting TEC has valuable causes of action against FANB, the objectors contend the benefit to the estate under the settlement is insufficient. Also the objectors assert the settlement affords FANB a secured claim in an amount exceeding the value of its collateral, in contravention of 11 U.S.C.A. § 506(a) (1979). Further, the objectors maintain the settlement will render TEC postconfirmation insolvent.

## III

Bankruptcy Rule 9019(a) recites in part: *"Compromise.* On Motion by the trustee and after a hearing on notice to creditors :.. and to such other persons as the court may designate, the court may approve a compromise or settlement." In evaluating a proposed settlement the court considers:

 (a) [t]he probability of success in the litigation;

 (b) the difficulties, if any, to be encountered in the matter of collection;

 (c) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it;

 (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Drexel v. Loomis,* 35 F.2d 800, 806 (8th Cir.1929).

In assessing a settlement agreement the court is not obliged to determine and rule upon disputed facts and questions of law. Instead the court's duty is to "canvass the

---

**2.** An agreed order permitting the use of cash collateral securing the FANB claim was entered five days after the petition was filed.

**3.** The objecting creditors have filed claims as follows:

| Creditor | Amount |
| --- | --- |
| Energy Associates, Ltd. | $1,518,503.04 |
| Bechtel Construction, Inc. | $10,698,699.00 |
| American Insurance Co. | unliquidated |
| ITT Industrial Credit Co. | $1,411,579.20 |

American Insurance Co., an affiliate of Fireman's Fund Insurance Co., is a surety on certain TEC projects.

**4.** Ackermann owns thirty (30) percent of TEC's outstanding stock.

issues" and decide whether the settlement falls below the nadir in the range of reasonableness. *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir.1983), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

### A. Probability of Success on the Merits

Disputes between TEC and FANB involve the value of the collateral securing the bank's claim; whether TEC is entitled to damages from FANB for economic duress or similar cause; and, generally, whether FANB controlled TEC. The issue of control affects whether FANB is an "insider," 11 U.S.C.A. § 101(28) (Supp. 1985), for the purpose of avoiding preferences, as well as whether the FANB claim should be equitably subordinated. Although TEC believes the likelihood of success in litigating its disputes with FANB is unfavorable, the objectors assert the probability of success is great. Indeed, ITT Industrial Credit Co. (ITT) represents to the court that three or four creditors, presumably the objectors, are willing to pursue and bear the expense of TEC's causes of action against FANB.

### 1. Valuation of FANB Collateral

ITT contends the evidence is either: (1) insufficient to enable the court to determine the value of FANB's collateral; or (2) the record establishes that the agreement impermissibly affords FANB an allowed secured claim in an amount exceeding the value of the bank's collateral.

Section 506(a) of Title 11 of the United States Code recites in part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation....

In its schedules TEC reported an estimated value of $4,466,766.00 for the FANB collateral. In its disclosure statement TEC lowered the estimated value to $3,888,811.00.

Ronald Brenner, TEC's chief financial officer, testified he believes the liquidation value of the bank's collateral is about $3,900,000.00 but that the book value of the collateral would be a little more than $7,000,000.00 provided TEC's plan is confirmed in the not too distant future. Brenner also testified:

> Q. What do you think is the absolute upper limit that under any set of circumstances the bank's collateral would be valued at *on a going concern?* I am not asking what you think would probably happen, but in the most extreme situation, what do you think is the upper limit of value that could be placed on the bank's collateral?
>
> A. I think about $5 million.
>
> Q. $5 million.. And is that your opinion as to what is most probably going to happen if there is *liquidation?*
>
> A. That would be the most probable upper limit, although, *in liquidation*, I guess, *it could go higher than that.*[5]

The court finds this testimony confusing.[6]

According to Brenner the present value of the two notes TEC proposes to give FANB pursuant to the settlement is $5,445,000.00.[7] In a worst case scenario in liquidation Brenner believes FANB would realize about $4,700,000.00 on its total claim. However, Brenner also testified the

---

**5.** Transcript of Proceedings at 116 (Oct. 29, 1985) (emphasis added).

**6.** The court suspects the word "litigation" should be substituted for "liquidation" in the quotation.

**7.** Brenner testified the present value of the secured note in the face amount of $6,000,000.00 is $5,100,000.00 and that the present value of the $625,000.00 convertible subordinated note is $345,000.00.

bank might realize $5,900,000.00 on its total claim.[8]

Almost one year prior to TEC's bankruptcy, in an internal memorandum (Exhibit 16), FANB recognized that $2,300,000.00 might be an optimistic value for its collateral.[9] The same memorandum reflects that the going concern value of the collateral might be only $4,600,000.00 to $4,800,-000.00.

Based on the present record it appears probable that the value of FANB's collateral is less than $5,000,000.00.

### 2. *Preference and Equitable Subordination Claims*

The objectors contend FANB is an "insider," 11 U.S.C.A. § 101(28) (Supp.1985), for the purpose of avoiding preferences because the bank controlled TEC. This contention and the assertion that FANB's claim should be equitably subordinated require a detailed review of the facts.

As previously noted, in December 1983 TEC informed FANB of significant setbacks and presented its plan for recovery. While FANB believed its total credit to TEC had approached "the limit of prudent bank involvement," it nonetheless loaned TEC $1,300,000.00 on January 27, 1984, to "meet payroll and keep trade creditors at bay."[10] The recovery plan did not proceed as expected; an equity investment was delayed and anticipated research and development funds became unavailable. When FANB was so informed in March 1984, bank officials were adamant in their position that TEC should focus on a sale to solve its financial dilemma. Still hopeful that research and development funds, or other funding, could be obtained from some source, TEC favored a low key approach to a sale.

During a meeting on April 3, 1984, Pete Houston, chief credit officer of First American Corporation, the holding company for FANB, and Ackermann disagreed about whether TEC should be seeking a buyer. Ackermann had previously acknowledged, in late January 1984, that a sale was the ultimate safety net in the event TEC's recovery plan failed. Brenner, TEC's chief financial officer, had concluded in February 1984 that TEC should seek a corporate purchaser. FANB and TEC officials agreed to reconvene on April 18, 1984, at which time TEC would detail its proposal for recovery.

After reviewing the recovery plan proposed by TEC's managers, Brenner informed Ackermann the proposal contained errors and that the likely result was a $2,500,000.00 loss, as opposed to the projected $500,000.00 profit. FANB denied Ackermann's request for a postponement of the scheduled April 18th meeting.

Although TEC did not have a detailed recovery proposal to present to FANB on April 18th, Ackermann was able to report that: (1) TEC had written confirmation it would receive an increase of at least $2,000,000.00 on its contract with Bechtel on the Hope Creek project; and (2) a firm commitment had been obtained for one-half of a proposed research and development limited partnership preferred stock offering, which would generate $4,000,000.00 in capital. According to Ackermann, this report did not appear to please FANB officials.

At a second meeting of FANB and TEC officials on April 18th, the bank presented four demands:

(1) TEC must give first priority to a sale of the company;

---

**8.** The transcript recites: "Q. So, if you went to *liquidation* with the bank, you think that the most probable result is that they would be allowed five million [$5,000,000.00] on their secured claim, and they would get nine hundred thousand [$900,000.00] on their unsecured claim. A. Correct." Transcript of Proceedings at 117 (October 29, 1985) (emphasis added).

Again, the court suspects the word "litigation" should be substituted for "liquidation." See note 6, *supra*.

**9.** The preparation date of this memorandum is unclear, but reference is made therein to another memorandum dated May 23, 1984.

**10.** See Exhibit 14 (Credit Request/Commitment).

(2) TEC must hire a consultant acceptable to FANB to assist in the operation and sale of the company;

(3) TEC must implement a lock box so that its receivables would go directly to FANB; and

(4) Ackermann, Mott, and Robinson, guarantors of TEC's debt to FANB, must pledge their TEC stock to FANB as additional collateral.

If its demands were not met FANB stated it would cut off TEC's line of credit and refuse to honor any checks issued by TEC after 1:00 p.m. that very day. When these demands were made TEC was not in default on its payments to FANB. While TEC was in default on certain ratios required under its loan agreement with FANB, the bank had not declared any default. Further, TEC's unused line of credit at FANB may have been as much as $1,200,000.00 on or about April 18, 1984.

Following the advice of legal counsel, Ackermann went to FANB's offices to meet with Jim Smith, FANB's CEO, in the afternoon of April 18th. According to Ackermann, Smith assured him the purpose of the demands was to compel him to understand FANB's position that he must make selling TEC his primary objective. A bank memorandum (Exhibit 15), prepared by someone other than Smith, indicates Ackermann tacitly agreed to FANB's four demands. In any event, the line of credit was reinstated and none of TEC's checks were dishonored. If the credit had not been reinstated TEC could not have continued to operate. A chapter 11 filing would probably have been TEC's only alternative at the time.

On April 23, 1984, the TEC board of directors, with one dissenter (Ackermann), voted to give first priority to the sale of TEC. As previously noted, E.F. Hutton was retained to facilitate the sale. An offering memorandum was prepared in May 1984 and distributed in June to approximately one hundred prospective purchasers.

Also in May 1984, on the basis of Ackermann's recommendation, TEC hired Jack Hannigan as a consultant. Hannigan's loyalties were questioned by Ackermann before he was hired because Hannigan, recommended by FANB, was a former member of the board of directors for FANB Nashville. But Hannigan, credited with the favorable turnaround of Genesco, reportedly assured Ackermann that TEC would have his undivided loyalty.[11] TEC could not have hired a consultant who was unacceptable to FANB.

A lock box arrangement was implemented whereby TEC's account receivables went directly to the custody of FANB. These receivables were, however, deposited in TEC's account at FANB. According to Brenner, the lock box did not materially alter TEC's operations. Weekly, TEC's accounting staff prepared a schedule of accounts payable. Brenner reviewed the schedule and then consulted Ackermann for his approval and suggestions as to priority of payments. Thereafter, Brenner submitted the schedule of payments to FANB. Ackermann testified that several times payments were deferred contrary to his expectation, but he did not know whether the deferments were attributable to Brenner or FANB.

FANB's fourth demand, pledge of the guarantor's stock, went unsatisfied.

TEC did not have sufficient funds to meet its May 1984 payroll. On May 25, 1984, TEC borrowed $500,000.00 from FANB. This loan, secured by an income tax refund and a receivable, was paid in full in the latter part of June 1984.

In June 1984 Brenner had concluded that a sale was TEC's only viable alternative. He questioned Ackermann's commitment to selling TEC. Brenner believed no purchase offer had been made because Ackermann's asking price was too high.

---

**11.** Interestingly, the handwritten notes of Pete Houston (Exhibit 24) recite in part: "(1) Speak to Hannigan A What is his timetable on *effecting* new leadership? B Is he with it or not? Thought his role was more meaningful.—on site leader (2) If Hannigan is not with it, then we need to work toward 51% and handle management issue ourselves."

At the end of June 1984 TEC was in default on two notes to FANB. During a meeting on July 18, 1984, Kenneth Roberts, chairman of the board and CEO for First American Corporation, hand-delivered a letter to Ackermann, Mott, and Robinson demanding payment of the entire TEC indebtedness to FANB. The letter recites that the following actions are necessary if the guarantors expect FANB to suspend immediate action to collect the indebtedness:

1. Mr. Ackermann must immediately relinquish the duties and responsibilities of the chief executive officer which will be reassigned by TEC's Board to an individual reasonably satisfactory to First American. However, if the Board desires Mr. Ackermann to retain the title of Chief Executive Officer, he may do so for the appearance of continuity. The Board must charge the new individual that it designates to assume the duties of the chief executive officer with (a) maintaining effective management of TEC for the benefit of creditors and shareholders and (2) proceeding as soon as possible with the sale of the company in a commercially reasonable manner so as to satisfy the claims of creditors and to be in the best interests shareholders.

2. Messrs. Ackermann, Mott, and Robinson must immediately pledge to First American all of the stock in TEC owned or controlled by them as collateral to secure their personal guaranties and to secure the debt of TEC. As part of this pledge, the guarantors will immediately transfer to First American the irrevocable right to vote the stock. Before exercising this right, First American will consult with guarantors.[12]

The letter further provides that FANB will commence an action to collect the TEC debt against one or more of the guarantors if the conditions are not satisfied by August 6, 1984.

In response TEC offered to hire a new CEO and to establish a voting trust. Holding firmly to its demands, FANB rejected TEC's proposal. Thereafter, on or about August 8, 1984, Mott and Robinson pledged their stock, about thirty (30) percent of the outstanding TEC stock, to FANB. Ackermann declined to pledge his stock and was sued by FANB on or about August 9, 1984.

On August 17, 1984, Brenner, accompanied by TEC's attorney, met with two officers of FANB and the bank's attorney. According to Brenner's notes, obtaining voting control of TEC was critical to FANB. His notes recite in part: "From a control standpoint they [FANB] already have it."[13] Brenner and three other TEC shareholders (Tony Buhl, William Hartman, and Ron Nutt), who collectively held slightly more than twenty (20) percent of TEC's outstanding stock, negotiated an escrow agreement with FANB.

On September 24, 1984, the loan agreement between FANB and TEC was further amended. In consideration of TEC's agreement to restructure its senior management and a pledge of the majority of the voting rights in TEC's stock (by Mott, Robinson, Brenner, Buhl, Hartman, and Nutt), FANB agreed to, and did, lend TEC an additional $1,000,000.00. FANB also extended the maturity dates of the two TEC notes in default. The bank waived certain other defaults so TEC could get its financial statements certified. Additionally, TEC released FANB from any cause of action related to its loan agreement with the bank. The voting rights agreement giving FANB control of a majority of TEC's voting stock was escrowed with TEC's legal counsel. Delivery to FANB was delayed until December 1984.

Confronted with the demand of TEC's board of directors, Ackermann resigned as TEC's CEO on or about September 18, 1984. All of the candidates to fill Ackermann's position were recommended by FANB. In mid-October 1984 TEC hired Curry Spivey as its new CEO. He contin-

---

**12.** Exhibit 35.

**13.** Exhibit 25.

ues to serve in that capacity. Prior to his employment by TEC, Spivey disclosed to TEC's board of directors that he is a close personal friend of an executive official of FANB and that he has borrowed sizeable sums from FANB Nashville. On Spivey's recommendation, active efforts to sell TEC ceased in November 1984, in part because TEC had failed to meet the projections in its offering memorandum. Brenner testified that Spivey has acted in TEC's best interest.

In mid-January 1985 TEC informed FANB a chapter 11 filing was a possibility if TEC's continuing problems with Bechtel on the Hope Creek project were not resolved. According to Brenner, FANB opposed a bankruptcy filing by TEC. In March 1985 when TEC notified FANB it had to file a chapter 11 petition the bank's response reportedly was, "That is your decision." [14]

During the one year period preceding bankruptcy TEC paid FANB approximately $883,000.00 on its principal debt and interest exceeding $970,000.00. In the ninety-day period preceding bankruptcy principal payments total nearly $346,000.00 and interest payments exceed $95,000.00.

██ This court believes it is improbable that TEC can establish that it was controlled by FANB. FANB did not control TEC's contract or personnel decisions; the bank was not involved in production schedules or purchase order decisions. Further, FANB did not control TEC's accounts payable; TEC scheduled its payables and priority thereof; the evidence is insufficient to establish that FANB controlled postponement of payments Ackermann testified were unexpectedly deferred. The court recognizes the conflict between the testimony of Brenner and Pete Craven, a former TEC vice-president, regarding the bank's involvement in negotiations with Bechtel. Brenner testified that TEC did not have to obtain FANB approval of its settlement negotiations with Bechtel. But Craven unequivocally testified Brenner told him on more than four occasions that a settlement amount was or was not acceptable to FANB. This testimony, however, does not persuade the court that FANB controlled TEC's negotiations with Bechtel.

Furthermore, the four demands FANB made in April 1984 were not all satisfied initially. Also, two months or more elapsed between the time FANB pressed for Ackermann's removal as CEO and his resignation.

A consultant was not needlessly thrust upon TEC. Also, as a consultant, Hannigan did not have control of TEC. Further, though there is a nexus between Hannigan and FANB, he certainly was not controlled by FANB. There also is no evidence Spivey, TEC's current CEO, is or has been controlled by FANB. Both men endeavored to restore the profitable operation of TEC, a goal mutually beneficial for FANB and TEC.

██ The lock box agreement is clearly not sufficient per se to establish control. *In re Belco, Inc.*, 38 B.R. 525, 530 (Bankr. W.D.Ok.1984). Financial power over a debtor does not necessarily impute insider status to a lender-bank. *Schick Oil & Gas, Inc. v. Federal Deposit Ins. Corp.*, 35 B.R. 282, 285 (Bankr.W.D.Ok.1983).

Although FANB attained voting control of TEC's stock the bank never exercised that control. The explanation that FANB desired such control to assure a bona fide purchase offer, for a reasonable value, was not rejected by TEC's stockholders is highly credible.

Significantly, TEC has had the benefit of legal counsel throughout its debtor-creditor relationship with FANB.

This case is factually distinguishable from *In re American Lumber Co.*, 5 B.R. 470 (D.Minn.1980), where the lender-bank clearly controlled its debtor's business to the detriment of unsecured creditors. Participatory control of TEC by FANB is not demonstrated in the record before the court.

14. Transcript of Proceedings at 104 (October 29, 1985).

Assuming arguendo FANB was an insider[15] in relation to TEC and all the elements of 11 U.S.C.A. § 547(b) (Supp. 1985) exist, § 547(c)(2) affords FANB a substantial, if not insurmountable, defense to avoidance of most of the payments FANB received in the one year period preceding bankruptcy. With some exceptions the payments received by FANB represent routine installments. The most conspicuous exception is the $500,000.00 principal payment on June 19, 1984. The court is convinced FANB did not control, and thus was not an insider of, TEC when this payment was made. Arguably, payments against the additional $300,000.00 line of credit extended in March 1985 are outside the scope of § 547(c)(2). Reasonable minds may differ on the issue. The note evidencing the $300,000.00 revolving credit is payable on demand, whereas the other TEC notes to FANB, with one exception, have stated maturity dates. Also, in September 1984, at a time when FANB appears to have been its affiliate,[16] TEC made an additional interest payment of approximately $50,000.00 which probably is avoidable if insolvency can be proven.

Equitable subordination is appropriate only where: (1) the claimant has engaged in inequitable conduct; (2) the misconduct injures creditors or confers some unfair advantage upon the claimant; and (3) subordination would not be inconsistent with the provisions of the Bankruptcy Code. While FANB exercised leverage on TEC it does not appear that the bank's conduct was inequitable. ITT suggests the response prepared by FANB to inquiries about TEC's credit is misleading.[17] But the FANB memorandum, dated April 26, 1984, was not inaccurate as of that date

and there is no evidence any creditor was misled by FANB. Neither benefit to FANB nor injury to creditors as a consequence of the bank's conduct is apparent. Hence, it appears very unlikely that FANB's claim could be equitably subordinated.

### 3. Damages for Economic Duress

TEC may have some cause of action for interference by FANB in the conduct of its business. It is specifically alleged that the FANB lawsuit against Ackermann had an adverse impact on the effort to sell TEC. However, damages to TEC appear speculative. Furthermore, TEC was in default when FANB sued Ackermann based on his guaranty. While TEC might have a cause of action due to FANB's threatened cutoff on April 18, 1984, of TEC's line of credit,[18] the bank did not in fact cut off TEC's credit. Further, as partial consideration for an additional $1,000,000.00 loan in September 1984, TEC waived any cause of action it might have against FANB related to the parties' loan agreement. Consequently, recovery for economic duress also appears unlikely.

### B. Difficulty in Collection

Presumably any judgment TEC obtained against FANB would be collectible. Hence, risk of collectibility is not a factor.

### C. Complexity of Litigation, Expense, and Delay

While TEC maintains undertaking all the litigation against FANB suggested by the objectors would involve an enormous, multifaceted effort, ITT's attorney believes litigation of TEC's claims against FANB would not be very complex. However, liti-

---

**15.** ITT contends FANB was an insider because the bank was an "affiliate" of TEC. FANB did hold with power to vote more than twenty (20) percent of TEC's stock, apparently for a reason other than to secure debt. Hence, according to ITT FANB was an affiliate, 11 U.S.C.A. § 101(2)(A) (1979), and therefore an insider, of TEC. 11 U.S.C.A. § 101(28)(E) (Supp.1985). ITT asserts FANB became an affiliate of TEC in August 1984, when Mott and Robinson pledged

their thirty (30) percent interest in TEC to the bank.

**16.** See note 15, *supra.*

**17.** Exhibit 48.

**18.** See *K.M.C. Co., Inc. v. Irving Trust Co.,* 757 F.2d 752 (6th Cir.1985) (jury award of $7,500,-000.00 for lender's breach of financing agreement affirmed).

gation against FANB, described by TEC as "a determined and well-financed opponent," would undeniably be expensive. The disputes between TEC and FANB could require many months to resolve. Asserting the delay and expense associated with litigation could be fatal to its chances for reorganization, TEC argues:

> [W]ithout an agreement and during extended litigation with its major secured creditor, it is hard to imagine how the debtor will be able to confirm a Chapter 11 plan and continue its operations. In other words, the delay and uncertainty could kill the company. Along with TEC's hopes for reorganization would go the jobs of 100 TEC employees, and a monthly payroll of more than $250,-000.00; and the opportunity for speedy payment of priority medical claims of employees, tax claims of the United States, and others, totalling nearly $500,-000.00.[19]

Although the litigation does not appear to be inordinately complex, assuming arguendo TEC can afford the expense of litigation, the attendant delay may indeed extinguish TEC's prospects for successfully reorganizing and continuing in business.

### D. *Interest of Creditors and Deference to Their Views*

TEC maintains the proposed settlement is integral to its chapter 11 plan. TEC's plan, which provides for payment in full of priority claims, divides unsecured creditors into two classes. Reportedly, the class of unsecured creditors whose claims are less than $7,500.00 have overwhelmingly accepted the plan; also, a large majority of the class of unsecured creditors whose claims exceed $7,500.00 have accepted the plan. Further, the creditors' committee favors approval of the proposed settlement. The creditors' committee support is very

significant because the committee employed special counsel to investigate the conduct of FANB in its relationship with TEC.

Excluding the FANB claim, the objecting creditors hold the largest claims against TEC. However, TEC has objected to claims filed by Bechtel and Energy Associates and is involved in litigation with ITT to determine whether ITT's claim is secured.

 Contending the court should disapprove the settlement, Bechtel argues: the settlement places TEC in a negative equity position through 1988; state law permits redemption by a corporation of its own stock only from unreserved and unrestricted earned surplus; TEC will be barred by state law from redeeming stock as proposed in its plan because it will have no unreserved and unrestricted earned surplus for at least the first four years of its plan. Tenn.Code Ann. § 48–1–513 (1984) (*Right of corporation to acquire and dispose of its own shares*) is not an impediment to the settlement. TEC may redeem its stock as proposed pursuant to Tenn.Code Ann. § 48–1–513(c)(4) (1984).[20]

### IV

Balancing the relevant factors, the court is sensitive to TEC's position that litigation with FANB, its principal secured creditor, may eliminate the prospect of a successful reorganization. Considering the investigation of its special counsel, the support of the settlement by the creditors' committee is very significant. However, it is also significant that ITT and one or more of the objectors are prepared to undertake on behalf of the estate, and bear the expense of, TEC's causes of action against FANB. But the court has considered those causes of action and believes, with the exception

---

**19.** TEC's Proposed Findings of Fact and Conclusions of Law at 55.

**20.** Tenn.Code Ann. § 48–1–513(d) (1984) enacts: "No purchase of or payment for its own shares shall be made at a time when the corporation is insolvent or when such purchase or payment would make it insolvent." However in the Ten-

nessee General Corporation Act "insolvent" means inability to pay debts as they become due in the usual course of business, not negative equity. Tenn.Code Ann. § 48–1–102(14) (1984). TEC projects it will have sufficient income to pay its debts as they become due.

of preference actions to recover additional interest paid in September 1984 and payments against the $300,000.00 line of credit extended in March 1985, litigation with FANB will probably prove disadvantageous to TEC, in view of the slight probability of success and the expense.

However, the valuation of FANB's collateral is troublesome. The settlement agreement proposes fixing FANB's secured claim in the amount of $6,000,000.00. But, considering the record presently before the court, it appears probable that the value of FANB's collateral is less than $5,000,000.00. Because the testimony as transcribed on the valuation question is confusing [21] the court defers decision on whether to approve the settlement. Additional evidence or testimony on the valuation issue may be proffered by any party in interest at 9:00 a.m. on December 13, 1985, prior to the hearing on confirmation of TEC's plan. Any party in interest desiring to proffer additional proof shall give notice of expected witnesses and provide copies of proposed exhibits to all counsel whose appearance is noted in this Memorandum on or before Monday, December 9, 1985.

IT IS SO ORDERED.

## MEMORANDUM AND ORDER APPROVING DEBTOR'S PROPOSED SETTLEMENT WITH FIRST AMERICAN NATIONAL BANK

On December 5, 1985, the court entered a memorandum and order on a proposed settlement between Technology for Energy Corporation (TEC) and First American National Bank (FANB). Because the testimony as transcribed on the valuation of FANB's collateral was confusing, the court deferred decision on whether to approve the settlement and permitted interested parties an opportunity to proffer additional evidence on the valuation issue.

On December 13, 1985, at the inception of the adjourned hearing on the proposed settlement, TEC's attorney announced that FANB had agreed to modify the settlement by waiving payment on confirmation of $640,000.00 against the proposed $6,000,000.00 secured note. This permitted further modification of TEC's proposed plan, increasing the cash dividend to unsecured creditors.

Three of the four creditors objecting to the settlement withdrew their objections. The fourth creditor, American Insurance Company, was not represented at the hearing. The two objecting shareholders, Naxos Holdings, B.V. and Norbert Ackermann, Jr., persisted in their objection to the settlement.

The only witness at the December 13th hearing was Ronald Brenner, TEC's chief financial officer for the last five years. Brenner previously testified he believed the value of FANB's collateral was within the range of $4,500,000.00 to $5,000,000.00. However, on December 13th Brenner testified he believes $5,600,000.00 is the lowest value for the FANB collateral TEC could hope to establish in litigation. Brenner further testified FANB might be able to establish that the value of the collateral is as high as $7,200,000.00. The change in Brenner's testimony is attributable to TEC's actual postpetition experience, which is:

| Collateral | Amount Received |
|---|---|
| Accounts receivable | $1,944,000 |
| Dunegan receivable | 796,000 |
| Contracts in progress | 1,696,000 |
| Retainage | 124,000 |
| | $4,560,000 |

TEC expects to collect $97,000.00 more from accounts receivable. TEC also expects to receive an additional $97,000.00 from contracts in progress existing as of March 29, 1985, the bankruptcy petition date, and $78,000.00 more in retainage payments. The sum of these amounts and the $4,560,000.00 in proceeds actually received postpetition is $4,832,000.00. Adding to this sum the liquidation values of $421,-338.00 [1] for inventory and $339,350.00 for

---

21. See notes 6 and 8, *supra,* and accompanying text.

1. This amount represents approximately twenty-five (25) percent of the book value of TEC's

furniture, fixture, and equipment,[2] TEC asserts it would be very difficult to prove the value of FANB's collateral is materially less than $5,600,000.00. The court agrees.

The present value of the two notes TEC proposes to give FANB pursuant to their settlement is $5,445,000.00, according to Brenner's unchallenged testimony. This amount is less than the probable value of the FANB collateral.

TEC insists it cannot service a $5,600,000.00 secured debt at a reasonable rate of interest during the first year following confirmation but that it can meet the below market interest payment due under its settlement with FANB.

Since the court is now satisfied that the proposed settlement is fair, reasonable, and in the best interest of creditors, the settlement is approved.

IT IS SO ORDERED.

inventory after allowing for a $500,000.00 reduction in value due to obsolescence.

**2.** FANB is not the only creditor with a security interest in TEC's furniture, fixtures, and equipment. Priorities as to specific items are not detailed in the record.