In re CHAS. P. YOUNG COMPANY, Chas. P. Young New York, Inc., Chas. P. Young Chicago, Inc., Chas. P. Young California, Inc., f/k/a Jeffries Banknote Company, Inc., Fidelity Printing Company, Inc., d/b/a Chas. P. Young Houston, Debtors.

CPY COMPANY (formerly Chas. P. Young Company), et al., Plaintiffs,

v.

AMERISCRIBE CORPORATION, et al., Defendants.

Bankruptcy No. 89 B 11879(CB). Adv. No. 91-6021A.

United States Bankruptcy Court, S.D. New York.

June 22, 1992.

Hahn & Hessen, New York City, for Shearson/E.F. Hutton, defendants.

Bizar Martin & Schneider, New York City, for plaintiff.

## PROCEDURAL BACKGROUND

CORNELIUS BLACKSHEAR,
Bankruptcy Judge.

CPY Company (f/k/a Chas. P. Young Company) (hereinafter "New CPY"), CPY New York Company (f/k/a Chas. P. Young New York, Inc.), Chas. of Illinois, Inc. (f/k/a Chas. P. Young Chicago, Inc.), CPY Company of California, Inc. (f/k/a Chas. P. Young California, Inc. f/k/a Jeffries Banknote Company, Inc.), Fidelity Printing Company, Inc. d/b/a Chas. P. Young Houston, filed a petition for relief with this Court under chapter 11 of title 11 of the United States Code on July 31, 1989. 11 U.S.C. § 101 *et seq.* The Debtors, as Debtors in Possession ("DIP") (collectively "Plaintiff") assert three claims against defendants Shearson Lehman Hutton Inc. ("Shearson"), E.F. Hutton Corporate Income Trust Number 29, E.F. Hutton High Yield Trust Number 2, E.F. Hutton High Yield Trust Number 12, Shearson High Yield Fund, Inc., and Shearson High Income Bond Fund, Inc. (the "Shearson Defendants").

First, Plaintiff seeks to avoid a transfer to the Shearson Defendants as preferential under § 547(b)(4)(B) of the Bankruptcy Code (hereinafter "Code"). The transfer was made within one year of the filing of Plaintiff's Chapter 11 petition, and the Shearson Defendants are alleged to have been insiders. (Ninth Claim in Complaint at ¶¶ 131–139). Second, Plaintiff seeks to

avoid and recover transfers to the Shearson Defendants as fraudulent conveyances pursuant to §§ 548 and 550 of the Code and § 276 of the New York Debtor Creditor Law. (Tenth Claim in Complaint at ¶¶ 140–147). Third, Plaintiff seeks to avoid allegedly preferential transfers made within the 90 days preceding Debtor's Chapter 11 petition. § 547(b)(4)(A) (Eleventh Claim in Complaint at ¶ 134).

The Shearson Defendants have moved pursuant to Rules 12(b)(2), 12(b)(5) and 56 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule") 7012 and 7056, and Bankruptcy Rule 7004(f) for summary judgement and to be dismissed as defendants from the adversary proceeding.[1] Defendants move for summary judgment on the grounds that there are no genuine issues of material fact, entitling the Shearson Defendants to judgement as a matter of law.

### FACTS

In the late 1980's, Chas. P. Young Company ("Old CPY"), was the third largest printer of financial documents in the United States. In November 1986, E.F. Hutton & Company ("Hutton") led a syndicate that underwrote and offered for sale approximately $50.0 million in face amount of 13⅛ Senior Subordinated Old CPY Notes, due 1998 (the "High Yield Bonds"). Hutton also purchased approximately $11.2 million in face amount of these notes for their own account. Morgan Aff. ¶ 15.

The Old CPY Notes were subordinated to senior debt, to trade creditors and other creditors of Old CPY and its subsidiaries. Birchfield Aff. ¶¶ 6 & 7. The prospectus for the public offering of the Old CPY Notes (the "1986 prospectus") indicates that the proceeds from the sale were used to retire Old CPY's existing secured bank indebtedness of approximately $33.0 million, to expand into new markets, acquire new businesses, and for general corporate purposes. Morgan Aff. ¶ 16. Following the stock market crash of October 19, 1987, demand for financial printing declined, severely impacting Old CPY's printing operations and causing Old CPY to experience a lack of liquidity. Less than one month later, in November 1987, Old CPY defaulted on the second scheduled interest payment on Old CPY Notes. Morgan Aff. ¶ 17; Birchfield Aff. ¶ 8. At the time of the initial default on the Notes, in November 1987, the outstanding stock of Old CPY was owned by ECL Industries, Inc. ("ECL"), which in turn had all of its stock owned by Service Resources Corporation ("SRC"), a Panamanian corporation (collectively referred to as the "Old Management Team"). Birchfield Aff. ¶ 10.

In early 1988, Shearson Lehman merged with Hutton ("SLH"), acquiring Hutton's $11.2 million of Old CPY Notes. A subsidiary of Shearson Lehman, Bernstein–Macauley, Inc. had also purchased, for customer accounts, an aggregate of $6.0 million of Old CPY Notes. Additionally, mutual fund unit trusts marketed by Hutton owned $700,000 of Old CPY Notes. Thus the combined total of SLH's holdings of Old CPY Notes, including mutual fund holdings, was approximately $17.93 million, or about 36% of the total issue. Morgan Aff. ¶ 18.

Following the November 1987 interest payment default on Old CPY Notes, representatives of Hutton and other Noteholders met with representatives of Old CPY to discuss restructuring the Notes. In addition to the 1987 defaults, Old CPY failed to make the semi-annual interest payments due on May 1 and November 1, 1988, resulting in over $8 million in total unpaid interest charges on the Old CPY notes. Morgan Aff. ¶ 25. In December 1987, members of SLH replaced the Hutton representatives at the meetings. This *ad hoc* committee of Noteholders is referred to as "the Committee." Apart from their role as a creditor, SLH also agreed to act as the Committee's financial advisor and invest-

---

**1.** Shearson Defendants moved to dismiss for failure to serve process in accord with the Bankruptcy Rule 7004, thus thwarting *in personam* jurisdiction. However, this ground has been mooted.

ment banker; and because Hutton had previously underwritten the defaulted Old CPY notes, SLH agreed to waive their customary initial cash retainer and to accept instead a percentage of the total restructuring transaction as payment for their services. Morgan Aff. ¶ 20.

SLH also influenced the negotiations in its capacity as a creditor. "[N]egotiations proceeded on the basis that [SLH] would not declare defaults on the notes and instead would participate in the sale of Old CPY." Birchfield Aff. ¶ 11. The agreement establishing the ground rules for the sale of Old CPY (the "Initial Sharing Agreement") provided that a sale of Old CPY must meet certain conditions, or else must be approved by the Shearson Defendants; otherwise, a sale would constitute a default on the Old CPY Notes.

Plaintiff alleges that "[t]hese conditions [upon a prospective sale of stock or assets] essentially gave Shearson control over the manner in which the sale was to occur, gave it the right to veto any transaction, and to determine how the proceeds of any sale were to be distributed." Birchfield Aff. ¶¶ 13–16. Plaintiff further alleges that "[b]y restricting the ability of Old CPY and its subsidiaries to encumber their assets further, Shearson strengthened its position vis-a-vis the other unsecured creditors of old CPY and its subsidiaries...." Birchfield Aff. ¶ 18. Furthermore, "[a]lthough the Old CPY Notes were intended to be, and had been, subordinated to the claims of the creditors of Old CPY, including those of its subsidiaries, no provision was made in the Initial Sharing Agreement for any payment to any other creditors of Old CPY or its subsidiary corporations." Birchfield Aff. ¶ 16.

Old CPY agreed on March 16, 1988 to use their best efforts to sell Old CPY and to exchange the Old CPY notes for a part of the sale proceeds. Morgan Aff. ¶ 24. Dillon Reed & Co. was retained as Old CPY's investment banker to solicit bids and conduct negotiations. In August 1988 (as revised on October 19, 1988), a letter of intent was signed for the sale of assets of Old CPY. Morgan Aff. ¶ 26.

Plaintiff alleges that under the Final Sharing Agreement (amending the Initial Sharing Agreement in light of intent to sell Old CPY) SLH controlled virtually every aspect of the sale of Old CPY's assets to the purchasing group—CPY Acquisition Corporation—and that SLH's control continued even after the buyout, even to the extent of vetoing some prospective employees of the new entity ("New CPY"). Birchfield Aff. ¶ 28. SLH maintains that irrespective of its level of involvement as a creditor, advisor, and investment banker, it never controlled the board of directors, and its status never was that of an insider.

The sale was consummated in two steps on January 4, 1989 (the "Closing Date") and "[t]here is no dispute that on January 4, 1989, the Shearson Defendant's and the other noteholders received a payment of cash and securities from Old CPY—not Debtor New CPY—in exchange for their Old CPY notes." Morgan Aff. ¶ 7. Plaintiff asserts that these two sales constituted a single leveraged buyout ("LBO"), and should be considered as one transaction. Defendants assert these were two separate and distinct transactions. The terms of the transaction were as follows:

First, Old CPY sold its Jeffries Division to USBN for $5.25 million in cash and the reciprocal extension by USBN of a $1 million supplemental line of credit for a term of one year. The entire $5.25 million in cash was used to pay down Old CPY's existing revolving credit facility." Morgan Aff. ¶ 30. Second, Old CPY sold its remaining assets and related liabilities to the CPY Acquisition Corp. ("CPYAC"), a Georgia corporation formed by the Purchasing Group. In the first quarter of 1989, CPYAC changed its corporate name to CPY (a/k/a "New CPY").

Morgan Aff. ¶ 31.

In exchange for its assets, Old CPY received from CPYAC: approximately $7,500,000 in cash, $22,166,000 in principal amount of CPYAC's 14% Senior Subordinated Pay-in-Kind Debentures due 1999, 98,822 shares of CPYAC's Preferred Stock (stated value of $100 per share) and 63,246 shares of the Common Stock. CPYAC also

assumed certain related liabilities of Old CPY. Morgan Aff. ¶ 32 and Birchfield Aff. ¶ 30. At the closing date, Shearson agreed to provide CPYAC with a credit facility, separate from Shearson's role as advisor to the Committee or as a Noteholder, enabling CPYAC to borrow up to $2 million to fund cash requirements and pay operating expenses. Morgan Aff. ¶ 33.

Old CPY did not retain any of the proceeds of the sale. Pursuant to the Final Sharing Agreement, all of the proceeds were transferred directly to Shearson in exchange for the OLD CPY Notes held by the Shearson Group.[2] Birchfield Aff. ¶ 32.

Plaintiff alleges that "Shearson was fully aware that, on December 21, 1988, it and its group were in complete control of Old CPY (and thus its subsidiaries), by virtue of the control over the leveraged buyout, and that Shearson was an 'insider' for purposes of the Bankruptcy Code, and that as a result, any transfer from OLD CPY to Shearson would be an avoidable preference." Birchfield Aff. ¶ 35.

The Shearson Defendants allegedly received a fraudulent conveyance because they received cash, debentures, preferred stock of New CPY, and common stock of New CPY, in exchange for the Old CPY Notes "which Shearson knew were worthless." Birchfield Aff. ¶ 40. Plaintiff asserts that "as a result of the continued decline in Old CPY's business, it was clear to a virtual certainty to all at the time of the leveraged buyout that in the event of a liquidation of Old CPY, neither Shearson nor any of the other holders of the Old CPY Notes would receive any payments thereunder, whether of principal or interest." Birchfield Aff. ¶ 9; Salerno Aff. ¶ 7.

## LAW

*Summary Judgment:*

Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, provides that a court shall grant a motion for summary judgment when there is no genuine issue as to any material fact, such that the moving party is entitled to judgment as a matter of law. The party seeking summary judgment has the burden of establishing that no genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

In ruling on a motion for summary judgment the court's function is to determine whether any genuine issue of material fact exists, not to resolve any existing issues of fact or credibility. The judge is not to weigh the evidence and determine the truth of the matter, but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, conflicts of credibility should not be resolved on a hearing on a motion for summary judgment, unless the opponent's evidence is too incredible to be believed by reasonable minds. *Losch v. Borough of Parkesburg, Pa.*, 736 F.2d 903, 909 (3d Cir.1984). Summary judgment is particularly inappropriate when questions of intent are at issue *Friedman v. Meyers*, 482 F.2d 435, 439 (2d Cir.1973).

In determining whether any genuine issue of material fact exists, the record "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. at 2513.

■ Bankruptcy courts have denied summary judgment motions "unless the entire

---

**2.** "In exchange for the $17.93 million in Old CPY Notes held by the Shearson Defendants, and over $3.6 million in past due accrued interest, Old CPY paid the Shearson Defendants approximately $3.2 million in cash, $9,477,000 face amount of Debentures, 42,257 shares of Preferred Stock and 27,045 shares of Common Stock.... In addition to tendering its Old CPY Notes, Shearson Lehman subsequently loaned Debtor CPY $2 million under the Shearson credit facility and incurred fees of $629,000, which resulted in total consideration extended to Debtor CPY and subsidiaries of over $2.63 million in exchange for the cash payment to the Shearson Defendants of $3.2 million and the securities." Morgan Aff. ¶ 37.

record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances...." *Richardson v. Combs (In re Fred Combs)*, 40 B.R. 148, 151 (Bankr.W.D.Va.1984). In short, "the court cannot try issues of fact; it can only determine whether there are issues to be tried." *Board of Managers of St. Tropez Condominium v. Proof of Pudding, Inc. (In Re Proof of Pudding, Inc.)*, 10 B.R. 459 (Bankr.S.D.N.Y.1981). Therefore, not only must there be no genuine issue as to the evidentiary facts, but there must also be no controversy regarding the inferences to be drawn from those facts before summary judgment may be granted. *Schwabenbauer v. Board of Education*, 667 F.2d 305, 313 (2d Cir.1981).

*Preferences:*

Under the Bankruptcy Code, the bankruptcy trustee (or debtor-in-possession) is empowered to avoid certain prepetition transfers which are deemed preferential. § 547. To the extent property was transferred, the bankruptcy trustee may recover the property or its value to enlarge the bankruptcy estate for the benefit of all creditors. § 550. This prevents the debtor from choosing which creditors to repay, and instead allows an equitable distribution of estate property under the priority established by the Bankruptcy Code. A voidable preference occurs when there is a transfer of a debtor's property, made to benefit a creditor, on account of an antecedent debt, at a time when the debtor is insolvent, on or within 90 days preceding the filing of the bankruptcy petition, that results in the creditor receiving more than the creditor would have received had the transfer not been made and the bankruptcy estate liquidated under chapter 7. § 547(b).

If the transfer was to a creditor that was an insider of the debtor at the time of receipt of the alleged preferential transfer, § 547(b)(4)(B) extends the usual 90 day period for avoidance of preferences to one year. "Insider" is defined in § 101(31) of the Bankruptcy Code. Subsection (B)(iii) provides that a person in control of the debtor, if the debtor is a corporation, is an insider. The Code fails to define "person in control" or "control."

Therefore, insider status must be determined on a case by case basis through examination of the totality of the circumstances and the creditor's degree of involvement in the debtor's affairs. *In Re UVAS Farming Corp.*, 89 B.R. 889, 892 (Bankr.D.N.M.1988). "[A]n insider can be any entity whose close relationship to the debtor requires careful scrutiny of the questioned transaction." *Id.* at 892. More clearly, an insider is one with a close enough relationship with the debtor such that his conduct requires rigorous scrutiny by the courts. *In re Fabricators, Inc.*, 926 F.2d 1458 (5th Cir.1991), *citing In re Missionary Baptist Foundation of America, Inc.*, 818 F.2d 1135, 1144 n. 8 (5th Cir.1987). "Control" is defined by an examination of the facts, and "an opportunity to self-deal or exert more control than is available to other unsecured creditors" is indicative of insider status. *Uvas*, 89 B.R. at 892.

The court in *In re F & S Cent. Mfg. Corp.*, 53 B.R. 842 (Bankr.E.D.N.Y.1985) held that a creditor is in control of a debtor when the creditor has a special relationship with the debtor which can not be characterized as at arms length, and whereby the debtor can be compelled to repay the creditor's debt. 53 B.R. at 848. Thus, the control such persons exercise need not be legal or absolute. *Id.*

When the creditor has a stranglehold over the debtor, leaving the debtor powerless to act independent of the creditor, the creditor is an insider with control. *In re Belco, Inc.*, 38 B.R. 525 (Bankr. W.D.Okla.1984). However, a debtor's inferior bargaining position is not enough to make a creditor a control person. *Uvas*, 89 B.R. at 893. Mere financial power is incidental to debtor-creditor relationships and does not itself amount to control over the debtor. *Id.*

Actual management of a debtor is control. *In re Technology for Energy Corp.*, 56 B.R. 307 (Bankr.E.D.Tenn.1985).

Actual management means controlling such things as debtor's personnel or contract decisions, production schedules, and accounts payable. *Id.* at 316. Nonetheless, in *In re Technology,* a creditor-bank's pressure to remove debtor's chief executive officer, imposition of a consultant, a lock box arrangement and voting control for the purpose of accepting a purchase offer, all failed to show "actual management" sufficient to raise the bank to insider status. *Id.*

As the preceding review demonstrates, the determination of insider status requires a fact intensive, *ad hoc* analysis.

*Fraudulent Conveyances:*

A debtor is empowered to avoid a fraudulent conveyance of debtor's property if the transfer was, voluntarily or involuntarily, made by the debtor within one year prior to bankruptcy. § 548(a). A transfer of a debtor's property may be fraudulent in either of two ways. First, a transfer of debtor's property is fraudulent when the transfer is made with actual intent to hinder, delay or defraud a creditor. § 548(a)(1). Second, a transfer is fraudulent when the debtor receives less than reasonably equivalent value for the transfer and was insolvent on the date of the transfer, or became insolvent as a result of the transfer. § 548(a)(2)(A).

■ Regardless of the number of steps taken to complete a transfer of debtor's property, such as in a leveraged buyout transaction, if they reasonably collapse into a single integrated plan and either defraud creditors or leave the debtor with less than equivalent value post-exchange, the transaction will not be exempt from the Code's avoidance sections. *See Kupetz v. Wolf,* 845 F.2d 842, 846 (9th Cir.1988) ("where the parties in an LBO fully intend to hinder the general creditors and benefit the selling shareholders, the conveyance is fraudulent...."); *In Re Ohio Corrugating Co.,* 91 B.R. 430, 433 (Bankr.N.D.Ohio 1988) ("[i]f the rights of creditors have been impaired, we see no reason to except LBO's from the operation of fraudulent conveyance laws...."); *Mellon Bank, N.A. v. Metro Communications, Inc. (In Re Met-*

*ro Communications, Inc.),* 945 F.2d 635, 646 (3rd Cir.1991) (the statutory language of § 548 provides no exception for the leveraged buyout transaction, and is broad enough to encompass same); *Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488 (N.D.Ill.1988) (holding that an LBO transfer is a fraudulent conveyance if the circumstances of the transfer are not "above board"); *see also In Re O'Day Corp.,* 126 B.R. 370 (Bankr.D.Mass.1991) (applying Uniform Fraudulent Conveyance Act and Bankruptcy Code fraudulent conveyance provisions to an LBO).

■ Thus, in LBO's, where a purchaser uses the assets of the target corporation to finance the acquisition, a series of transactions surrounding the LBO will often be collapsed into one transaction. *Wieboldt,* 94 B.R. at 502 ("a court should focus not on the formal structure of the transaction, but rather on the knowledge or intent of the parties involved in the transaction"); *Moody v. Security Pacific Business Credit Inc.,* 127 B.R. 958, 992 (W.D.Pa.1991) ("In analyzing the conveyances ... we are convinced that we should 'collapse' the various steps in the ... leveraged buyout and treat them as 'one integral transaction.'"); *O'Day Corp.,* 126 B.R. at 394 ("in view of the fact that all parties were aware of the structure of the transaction, and participated in implementing it, the Court will focus on the substance of the LBO's as one transaction, not on its form"); *In re Suburban Motor Freight, Inc.,* 124 B.R. 984, 998 (Bankr.S.D.Ohio 1990) (holding the court must look beyond the multicomponent transfers created by the parties to the essence of the transaction to assess the net effect of the transactions under review).

CONCLUSION

■ The Shearson Defendants' motion for summary judgment is denied. Significant, material issues of fact remain. In point of fact, a determination of insider status is a question of fact. *In re Missionary Baptist Foundation of America, Inc.,* 712 F.2d 206, 209 (5th Cir.1983). On that

138

basis alone, the issue of insider status is not particularly suited to disposition by summary judgment. Further, it is not clear that SLH's role was not that of an insider. The Initial Sharing Agreement and Final Sharing Agreement need be examined more closely and in light of information obtained from depositions to ascertain whether the Shearson Defendants intentionally gave themselves an advantage over Plaintiff's other unsecured creditors.

 With respect to the fraudulent conveyance claims; the determination of "intent" for the 548(a)(1) claim requires fact-intensive review. It is premature to rule on same as a matter of law since, as Plaintiff asserts, there has been limited document discovery from the Shearson Defendants and no depositions have yet taken place. Plaintiff's Brief at 9. With respect to the 548(a)(2) claim, evidence of value needs to be submitted to determine whether the Shearson Defendants gave "reasonably equivalent value" when they surrendered their Old CPY Notes.

With respect to the Eleventh Claim for relief, an allegedly preferential transfer made within 90 days preceding Debtor's Chapter 11 petition, there is clearly a dispute of fact as to whether the alleged payment was credited to a third party, through the Shearson Defendants as a mere conduit.

It is hereby Ordered that the Shearson Defendants motion for summary judgment is denied in all respects.