EDWARD P. WOLFRAM, JR. AND ZULA J. WOLFRAM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wolfram v. Commissioner
Docket No. 24886-85.
United States Tax Court
T.C. Memo 1987-422; 1987 Tax Ct. Memo LEXIS 419; 54 T.C.M. (CCH) 266; T.C.M. (RIA) 87422; August 25, 1987. Frank J. P. McManus, for the petitioners. Richard S. Bloom, for the respondent. DRENNAN MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: This case was assigned to and heard by Special Trial Judge Joan Seitz Pate pursuant to the provisions of section 7456(d) (redesignated as sec. 7443A(b) by the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2755) and Rules 180, 181 and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PATE, Special Trial Judge: Respondent determined the following deficiency in and additions to petitioners' 1980 Federal income tax: Deficiency
$ 3,611,593
Additions to Tax
sec. 6651(a)(1)
846,480
sec. 6653(a)
196,971
*421 The resolution of all issues necessary to determine the amount of the deficiency and additions to tax have been stipulated by the parties. The sole issue for our consideration is whether Zula J. Wolfram is entitled to relief from liability as an "innocent spouse" from taxes on a 1980 joint income tax return filed by petitioners. FINDINGS OF FACT Zula J. Wolfram (hereinafter "Zula") and Edward P. Wolfram, Jr. (hereinafter "Ted") were married when the petition in this case was filed. At that time, Zula resided in Las Vegas, Nevada, and Ted was incarcerated in a Federal prison in Tallahassee, Florida. Some of the facts in this case have been stipulated and are so found. Zula was born and raised in a rural area of Southern Indiana. Her parents were of moderate means. She graduated from high school in 1953 and, after working as a lab technician for approximately one year, married Ted. They had four children between 1955 and 1966, of which three were married and one was still at home in 1980. Ted met and married Zula while he was stationed in Indiana serving as an Air Force officer. After leaving the service, he obtained a position as a stockbroker with Bell & Beckwith *422 in Toledo, Ohio. He went on to become their managing partner and was serving in that position during all of 1980. While at Bell & Beckwith, Ted opened the following accounts: (1) Mrs. Zula Wolfram (Regular Account); (2) Zula J. Wolfram Cash Account; (3) Zula J. Wolfram Cash Account #2; (4) Zula J. Wolfram Bond Account; (5) ZJW-Investment Account #2; (6) Mrs. Zula Wolfram Option Account -- Solicited; (7) Mark III Corporation; (8) Mark III Corporation -- Special Account; (9) Z J W-M III Investment Account #1; (10) T Z Land & Cattle; (11) T Z Land & Cattle Cash Account; (12) T Z Exploration Inc.; (13) Country Boy Estates. During 1980, Zula was the principal shareholder and chairman of the board of Mark III Corp., which operated the Landmark Hotel in Las Vegas, Nevada. Zula was also chairman of the board of its wholly owned subsidiary, T Z Enterprise (formerly known as FAM Corporation), which operated the casino and gaming operations at the Landmark Hotel. Although the Mark III Corp. had a full-time controller to handle its administration, as board chairman, Zula frequently visited the hotel and, even when not there, made daily contact to monitor scheduled *423 entertainment. During 1980, Zula lent the Mark III Corp. at least $ 1,150,000 using funds which had been transferred from Bell & Beckwith. Zula was also a 95 percent partner in the Mark III Partnership, which leased the real estate and personal property used in the operation of the Landmark Hotel to the Mark III Corp. In 1979, the Mark III Partnership borrowed $ 1,000,000 from the Nevada National Bank. This loan was fully paid in July 1980 by a wire transfer from Mark III Corp.'s Special Account maintained at Bell & Beckwith. In 1980, Zula sold a portion of her interest in the Mark III Partnership for $ 4,200,000 realizing a gain in excess of two million dollars. During 1980, Zula also was president and principal shareholder of T Z Land & Cattle Inc., which operated several cattle ranches in Arkansas. She occasionally visited these ranches, paid the bills, received its monthly bank statements and kept the company's books and records. When funds were low in T Z Land & Cattle's bank account, Zula notified Ted, who in turn transferred funds to it from one of the accounts at Bell & Beckwith. During 1980, T Z Land & Cattle purchased a ranch for $ 830,000, requiring cash payments *424 of $ 90,000 at closing and $ 386,158.86 on October 1, 1980. Zula also owned and was president of T Z Explorations, which purchased and developed oil wells near Baton Rouge, Louisiana. She maintained a separate checking account at MidAmerican National Bank & Trust Co. (hereinafter "MidAmerican") to pay expenses relating to the oil business. Zula would inform Ted when she required additional funds and, during 1980, at least $ 300,000 was deposited into the MidAmerican account by checks from Bell & Beckwith. Zula received and reconciled the monthly bank statements from MidAmerican. In addition, petitioners maintained a horse ranch in Ocala, Florida, named Country Boy Estates, to breed and race Standard Bred horses. Zula took an active interest in the horses and, during 1980, wrote checks exceeding $ 230,000 to purchase horses for this operation. For her personal use, Zula maintained both a joint checking account with Ted at Toledo Trust and her own bank account in Las Vegas. During 1980, she deposited $ 458,500 of checks from Bell & Beckwith into the joint checking account. Zula also wrote the vast majority of checks on the joint checking account and reviewed the monthly *425 bank statements on both accounts. Petitioners owned a home in Grand Rapids, Ohio. In addition, during 1980, they purchased a condominium in Las Vegas for approximately $ 250,000, making a $ 60,000 cash down payment and obtaining a mortgage for the balance. Zula made the monthly mortgage payments of $ 2,836.92 from the joint checking account. Zula occasionally loaned money to her friends. During 1980 these loans exceeded $ 130,000. In 1980, petitioners owned eight rare Italian OSCA's (Officina Specializzata Construzione Automobili), a 1967 Lamborghini, a 1964 Maserati, a 1971 Mercedes, a 1979 Mercedes, a 1977 BMW, and five other cars. They also owned a jet aircraft costing $ 680,000. During 1980, Ted gave Zula numerous gifts of jewelry. Although none of the accounts at Bell & Beckwith were in Ted's name, he actually orchestrated all of the activity therein. By substantially overstating the value of securities held in these accounts [2] and by using such securities as collateral, he was able to advance monies to Zula and the various entities described herein. In this way, Ted misappropriated approximately $ 32,000,000 from Bell & Beckwith between 1978 and 1983. In 1980 *426 alone, he misrepresented over two million dollars. Although Bell & Beckwith was audited each year by its outside auditors, the Securities and Exchange Commission (hereinafter "the S.E.C."), the New York Stock Exchange (hereinafter "the "N.Y.S.E."), the American Stock Exchange (hereinafter "the A.S.E."), and the Ohio Securities Division, it was not until February 1983 that Ted's defalcations were uncovered. Ted's defalcations caused Bell & Beckwith to close its doors and subsequently liquidate under the Securities Investor Protection Act. Ted engaged a Certified Public Accountant (hereinafter "CPA") to prepare petitioners' 1980 joint income tax return. When completed, it comprised over 50 pages of complex data including the results of the operations of the entities described herein, $ 340,000 in payments Ted received as a partner in Bell & Beckwith, and $ 134,906.84 in other distributions and interest on Schedule B. It did not include z 2,214,849 in funds embezzled *427 from Bell & Beckwith. When Zula signed the tax return on April 9, 1982 she was not given adequate opportunity to inspect it. However, subsequent to signing, she neither reviewed the tax return, nor requested anyone to review it for her, nor asked anyone to explain the income or deductions reported thereon. On February 5, 1983, Ted called his family together and told them that he had embezzled a substantial amount of money from Bell & Beckwith. On the following day, both Ted and Zula conveyed all of their assets to Bell & Beckwith's Trustee in Liquidation. Ted subsequently pled guilty to criminal charges arising from his activities and, in September 1983, started serving his prison term. Before being sentenced, Ted took a lie detector test to show that he was the only person with knowledge of his defalcations. In October 1985, Zula and Ted were divorced. As of the date of trial, Zula was working as a cashier in Las Vegas earning a modest wage. She is suing Bell & Beckwith's independent auditors maintaining that they were negligent in their audits of Bell & Beckwith and that reliance on their financial representations has caused her substantial losses. She is also suing *428 the trustee in an attempt to regain possession of the assets she transferred to Bell & Beckwith which were not acquired with embezzled funds. In the notice of deficiency, respondent increased petitioners' gross income for adjustments to their distributive share of Mark III Partnership income of $ 1,013,111 and misappropriation of Bell & Beckwith assets of $ 4,927,110. Adjustments in exemptions, investment interest, as well as investment, foreign tax and new jobs credits were also made. In addition, respondent determined additions to tax under section 6651(a)(1) on the grounds that petitioners' income tax returns had not been timely filed and section 6653(a) on the grounds that the underpayment was due to negligence or intentional disregard of the rules and regulations. The parties have now agreed to the correct amount of all adjustments. Most significantly, it was agreed that the correct amount of all adjustments. Most significantly, it was agreed that the correct amount of embezzlement income was $ 2,214,849, and petitioners' share of Mark III Partnership income should only be increased by an adjustment to allowable depreciation of $ 66,433. Consequently, the sole issue *429 left for our decision is whether Zula is liable for that portion of the liability arising from the embezzled income and the decreased depreciation or should be absolved of such liability because she is an innocent spouse. In this regard, Zula contends that, during 1980, she was primarily a housewife, that title to these various entities and assets was generally in her name only because Ted believed that the S.E.C. would have objected to his personal involvement, that Ted in fact controlled all of the financial aspects of these various entities with Zula merely doing his bidding, that she trusted her husband to pay the correct amount of their Federal income tax liability as he had done for so many years in the past, that she was not informed by anyone of the large amounts of cash being withdrawn in her accounts at Bell & Beckwith, that she was not permitted to examine or question the income tax returns she signed, and that therefore, she qualifies as an innocent spouse under the Code. Moreover, she argues that because her husband and his lawyers convinced her that she had to sign over all of her assets to Bell & Beckwith's trustees, that currently, she is of modest means and imposition *430 of this liability would condemn her to a life of poverty. OPINION In general, when a husband and wife file a joint return they are jointly and severally liable for the amount of tax due. Sec. 6013(d)(3). However, "an innocent spouse" is relieved from liability for tax to the extent such liability is attributable to a substantial understatement of income attributable to grossly erroneous items of the other spouse if he or she meets all of the following requirements: (1) a joint return was filed; (2) there is a substantial understatement of tax attributable to grossly erroneous items of the other spouse on such return; (3) in signing the return the spouse did not know, and had no reason to know, that there was such substantial understatement; and (4) taking into full account all of the facts and circumstances, it is inequitable to hold the spouse liable for the deficiency for such taxable year attributable to such understatement (hereinafter referred to as the "first requirement", "second requirement", etc.). Sec. 6013(e)(1). [3] The liability for tax from which the innocent spouse is *431 relieved includes "interest, penalties, and other amounts." Sec. 6013(e)(1). The spouse claiming absolution has the burden of proving that all of the requirements of section 6013(e) are met. Lessinger v. Commissioner,85 T.C. 824, 838 (1985); Sonnenborn v. Commissioner,57 T.C. 373, 381-383 (1971); Rule 142(a). With these criteria in mind, we can quickly dispose of Zula's contention regarding the disallowed Mark III Partnership depreciation deduction. Since a partnership return must be read together with, or as an adjustment to, the partner's personal income tax return, the overstated depreciation taken by the Mark III Partnership is considered a "deduction" for purposes of the innocent spouse provisions. See Estate of Klein v. Commissioner,537 F.2d 701 (2d Cir. 1976), *432 affg. 63 T.C. 585 (1975). Therefore, to meet the second requirement of the innocent spouse provision, Zula must show that Ted was the "real" partner in the Mark III partnership and, consequently, the disallowed depreciation deduction was attributable to him, even though the partnership records listed her as the partner. In making our determination, we look to the economic realities of these transactions and not their form to determine the tax consequences attributable thereto. Frank Lyon Co. v. United States,435 U.S. 561 (1978); Houchins v. Commissioner,79 T.C. 570, 589-590 (1982). However, where the taxpayer seeks to avoid the form of his own agreement, a higher level of proof known as the "strong proof standard" is required. See Coleman v. Commissioner,87 T.C. 178, 201-203 (1986), on appeal (3d Cir., Mar. 10, 1987); Major v. Commissioner,76 T.C. 239, 247 (1981). See also Schulz v. Commissioner,294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960). We have carefully *433 examined the entire record and find that Zula has not carried this burden of proof. Except for Zula's testimony to the effect that her husband and his hirelings ran all of these enterprises, the evidence shows that she was, in fact, the partner in the Mark III Partnership. Zula admitted that on many occasions she flew to Las Vegas without her spouse, and that she participated in the Landmark Hotel's activities. More significantly, however, Zula presented little evidence of Ted's participation in the Mark III Partnership. We have no idea as to what he purportedly did, when, or how often he did it, how much time he spent on the partnership's affairs, or with whom he transacted business. Without this information, we have no basis for finding that Ted, not Zula, was the real partner. Consequently, as to the Mark III partnership depreciation adjustment, we cannot find that this item was attributable to Ted as required by the innocent spouse statute. Accordingly, section 6013(e) simply does not apply to this item. [4]
*434 Next, we must consider whether Zula is relieved of tax liability for the funds misappropriated from Bell & Beckwith. It is undisputed that the embezzlement income omitted from Ted and Zula's 1980 joint income tax return was attributable solely to Ted's activities. Therefore, Zula meets both the first and second requirements of the innocent spouse provisions with respect to this item. To meet the third requirement, Zula must prove both that she did not actual knowledge of the omitted income; and that she did not have reason to know of the omission. Sec. 6013(e)(1)(C); Estate of Jackson v. Commissioner,72 T.C. 356, 360-361 (1979). The standard we apply in determining whether a taxpayer had reason to know of the omission is "whether a reasonable person under the circumstances of the taxpayer at the time of signing the return could be expected to know of the omissions." Shea v. Commissioner,780 F.2d 561, 566 (6th Cir. 1986), affg. on this issue T.C. Memo. 1984-310; *435 Terzian v. Commissioner,72 T.C. 1164, 1170 (1979). The primary ingredients for making this evaluation are the circumstances facing the taxpayer and whether a reasonable person in the same position would infer that omissions had been made. Shea v. Commissioner,780 F.2d at 565-566. The cases clearly require that the spouse claiming relief from liability for an omission of income must be unaware of the circumstances which gave rise to that omission and not merely to the tax consequences thereof. Purcell v. Commissioner,86 T.C. 228, 238 (1986), on appeal (6th Cir., July 25, 1986), [5] and the cases cited therein. In cases litigated heretofore, *436 we have found the following three factors significant in determining whether a spouse had reason to know of omissions from gross income: (1) participation in business affairs or bookkeeping by the alleged innocent spouse, Quinn v. Commissioner,62 T.C. 223, 230-231 (1974), affd. 524 F.2d 617 (7th Cir. 1975); (2) the guilty spouse's refusal to be forthright concerning the couple's income, Adams v. Commissioner,60 T.C. 300 (1973); and (3) the presence of unusual or lavish expenditures, Mysee v. Commissioner,57 T.C. 680, 699 (1972) (hereinafter referred to as "first factor, "second factor", etc.). See Sanders v. United States,509 F.2d 162, 167 (5th Cir. 1975). As to the first factor, Zula contends that she was a housewife with no business training and that her only role in the family's financial affairs was to sign documents and checks as directed by her husband and the people he hired to run the various business ventures. Therefore, she argues that she did not sufficiently participate in the various *437 business enterprises held in her name to have reason to know of the omitted income. However, the record clearly shows that during 1980 Zula: (1) personally deposited millions of dollars into her personal bank accounts and those of the various entities which she headed up; [6] (2) personally wrote millions of dollars worth of checks; (3) inspected the bank statements for several of these entities and both personal accounts; (4) purchased a ranch, cattle, horses, and was privy to the operation of a major hotel and gambling casino; and (5) personally asked Ted to send her millions of dollars to cover the expenditures made by these entities. Although she may not have received or even seen the Bell & Beckwith statements detailing these withdrawals, she certainly must have surmised that this seemingly inexhaustible supply of funds had some source. If she believed, as she contends, that her husband was a superb stockholder, then those countless millions had to be attributable either to rather large commissions made from the operations of the firm or huge gains made in trading for his own account. Although large amounts of income were reported on the joint income tax return, those accounts *438 did not even approach the amounts required to account for the millions in unreported income involved in this case. Zula argues, however, that since the "experts", namely, Bell & Beckwith's auditors, S.E.C. personnel, N.Y.S.E. and A.S.E. examiners, etc., did not uncover Ted's defalcations during 1980, she, a mere housewife, should not be charged with such knowledge. We are admittedly perplexed by the unexplained gullibility of these experts. Defalcations of this magnitude, great enough to have caused the eventual collapse of the firm, would seem difficult to conceal. The record is silent as to why greater scrutiny was not given to the various accounts Ted had manipulated. Nevertheless, this does not obscure the fact that Zula handled huge sums of money on a day-to-day basis, and had personal knowledge of where it came from and where it went. Although she was not privy to the internal workings of Bell & Beckwith, she was aware that it could be counted on to supply funds for her various entities on a "when needed" basis. Therefore, *439 in filing a joint income tax return with her husband, she was required to use ordinary prudence and diligence to ascertain either that these funds were reported as income or that there was a satisfactory explanation of their non-taxable source. See Shea v. Commissioner,780 F.2d at 566; Estate of Jackson v. Commissioner, supra at 361. Zula never attempted to ascertain the nature of the available funds, never questioned whether any of the amounts received by her were reported on the joint income tax return, and never asked that someone explain explain the tax return to her. Because she was so intimately involved in the business affairs of the family, she had a duty to assure herself that the income reported on their joint income tax return was substantially correct. A spouse may not intentionally turn a blind eye upon the activities of her marriage partner and then claim relief based on the ignorance resulting therefrom. See Sanders v. United States, supra at 169. An evaluation of the second factor (the guilty spouse's forthrightness *440 concerning the couple's income), gives off mixed signals. Ted certainly was not candid in his representations to Zula as the sources of their income. However, the record is silent as to whether Zula ever questioned Ted as to the sources of the large amounts of money available to them and what explanation, if any, he gave her. Moreover, an inspection of petitioners' 1980 joint income tax return clearly shows that it was an extremely complex document. [7] This complexity would make it difficult for a lay person to ascertain its correctness and completeness. Nevertheless, the fact remains that Zula neither asked for sufficient time to review the return before signing it, nor did she subsequently request that the CPA who prepared it or any other person explain its contents to her. Under the circumstances present here, we feel she had a duty to make at least some minimal inquiry. *441 In evaluating the impact of the third factor, we first acknowledge that the use of unreported income for "ordinary support" may not be used as a basis to find that a spouse had reason to know of the income's existence within the meaning of the statute. Mysee v. Commissioner,57 T.C. at 698. However, the spouse may not close her eyes to unusual or lavish expenditures. Terzian v. Commissioner,72 T.C. at 1170. Since one person's luxury can be another's necessity, the lavishness of an expense must be measured from each family's relative level of ordinary support. Sanders v. United States, supra at 162. We start with the premise that Ted's reported income would have supported a rather high standard of living. His partnership income from Bell & Beckwith alone was much higher than "usual" or "average" among taxpayers and even without his defalcations would have supported a fine home, numerous automobiles, luxurious vacations and a country club membership. But, Ted and Zula's lifestyle was a far cry from this type of upper middle class *442 existence. In addition to the above listed accoutrements, they owned an expensive horse ranch in Florida, an extensive cattle ranch in the mid-west, a hotel and gambling casino in Las Vegas and numerous exotic automobiles. This enabled Zula to hob-nob with the aristocrats of the "horsey" set as well as stars of the entertainment world, even those who did not shirk from asking her for substantial loans. To top it all off, Zula and Ted owned their own jet airplane so they could fly to and from these various locations in style. This lifestyle was more than well-to-do; it can only be characterized as opulent, lavish, and extravagant. It certainly gave Zula plenty of reason to know that the funds had to come from some source. Although she voluntarily chose to ignore the fact that their reported income did not even come close to supporting this level of expenditures, that choice does not absolve her of the tax liability attendant thereto. See Estate of Jackson v. Commissioner,72 T.C. 356, 360-362 (1979). *443 Lastly, in considering the fourth requirement, we must determine whether, under the facts and circumstances, it is inequitable to hold Zula liable for the deficiency. Sec. 6013(e)(1)(D). In making this determination, we first focus on whether the spouse seeking relief significantly benefited from the understatement. [8] See sec. 1.6013-5(b), Income Tax Regs.[9] We then consider the financial circumstances of that spouse subsequent to the year in issue in determining whether "equitably" she should be relieved of liability. See Dakil v. United States,496 F.2d 431 (10th Cir. 1974). *444 Again, normal support is not considered a significant benefit in this determination. See sec. 1.6013-5(b), Income Tax Regs. However, as we have already determined, Zula enjoyed a lifestyle far beyond what can be characterized as normal, and our previous discussion disposes of the question of whether she significantly benefited from the understatement. There is no doubt that she enjoyed far more luxuries than Ted's reported income could have provided. Zula argues, however, that because she was forced to sign over all of her assets to Bell & Beckwith, is now divorced from Ted, and currently supports herself on a relatively humble salary, that holding her liable would condemn her to a life of poverty. Admittedly, the amount of liability involved here is substantial and we do not consider this argument lightly. However, on balance we do not find it inequitable to hold Zula liable for these amounts. Not only has she previously enjoyed the luxuries made available by the unreported income, but, she is currently maintaining two lawsuits which could result in the restoration of an undetermined amount of this property to her. The first suit is against Bell *445 & Beckwith's auditors for endorsing allegedly false financial statements which she purportedly relied on in sustaining substantial losses. The second lawsuit is against Bell & Beckwith's trustees in liquidation and maintains that they coerced her into signing over her property to them. A favorable decision as to either one of these law suits could materially restore her past wealth, which should not go free from this tax liability. Taking these factors into consideration, we are convinced that it would not be inequitable to hold Zula liable for these taxes. Since she has not carried the burden of proving that such "inequity" is present, we find that she also has not met the fourth requirement. Based on Zula's failure to carry her burden of proof as to the third and fourth requirements of section 6013(e), we hold that she is not an "innocent spouse" under that statute with respect to the unreported embezzlement income. Because of concessions Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended, and all rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Ted increasingly inflated the value of shares held in Toto, Ltd., a Japanese Corporation. By December 1982, these shares were valued by Bell & Beckwith at $ 278,558,418. They were worth approximately $ 5,000. ↩
3. Sec. 6013(e)↩ was amended by the Tax Reform Act of 1984 with retroactive application to all open taxable years to which the Internal Revenue Codes of 1954 and 1939 apply. See Pub. L. 98-369, sec. 424, 98 Stat. 494, 801-802 (1984-3 C.B. (Vol. 1) 309-310); H. Rept. 98-432, (Pt. 2) 1501, 1503 (Mar. 5, 1984). 4. Moreover, as to a deduction, the spouse seeking relief must show that the deduction had no basis in fact or law. Douglas v. Commissioner,86 T.C. 758, 763 (1986); Rule 142(a). This burden cannot be met by merely conceding the correctness of respondent's adjustment. Purcell v. Commissioner,86 T.C. 228, 238↩ (1986), on appeal (6th Cir., July 25, 1986). Zula has not provided us with evidence necessary to make such a determination. 5. In Purcell v. Commissioner, supra, where the taxpayer used her husband's corporate credit card for personal purchases under the delusion that the charges would be offset by amounts owed her husband, the Court held that the taxpayer did not have reason to know of the omission. However, there the same taxpayer knew of the covenant not to compete in a stock sale transaction, but not its tax consequences, she failed to meet the requirements of sec. 6013(e)(1)(C)↩. 6. In one transaction alone, she obtained funds to pay off a one million dollar note. ↩
7. The complexity of the other spouse's affairs is a permissible consideration. Sanders v. United States, supra↩ at 169. 8. Sec. 6013(e)(1)(C), prior to its amendment, explicitly required that we consider "whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income." While sec. 6013(e), as amended, no longer specifically requires that we make such a determination, this factor is still to be taken into account. See H. Rept. 98-432, (Pt. 2) supra at 1502; Purcell v. Commissioner,86 T.C. at 242; DeMartino v. Commissioner,T.C. Memo. 1986-263↩. 9. These regulations were promulgated prior to July 18, 1984, the effective date of present sec. 6013(e), which no longer includes a specific reference to a significant benefits test. But see Purcell v. Commissioner, supra↩ at 242.