**In re BELL & BECKWITH, Debtor(s).**

**Bankruptcy No. 83–0132.**

United States Bankruptcy Court, N.D. Ohio, W.D.

Nov. 4, 1988.

---

Fuller & Henry, Toledo, Ohio, for Trustee.

Stephen P. Harbeck, Washington, D.C., for SIPC.

H. Buswell Roberts, Jr., Toledo, Ohio, for Zula J. Wolfram.

## MEMORANDUM OPINION AND ORDER

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court after Hearing on the Trustee's Motion for Approval of and Authority to Perform Compromise and Settlement Agreement with Zula J. Wolfram. The Securities Investor Protection Corporation filed a Memorandum in opposition to the proposed settlement. At the Hearing, the parties had the opportunity to present the evidence and arguments they wished the Court to consider in reaching its decision. The Court has reviewed the testimony, exhibits, and the arguments of counsel, as well as the entire record in this case. Based on that review, and for the following reasons, the Court finds that the Objection of the Securities Investor Protection Corporation should be Overruled, and the Proposed Settlement should be Approved.

### FACTS

The facts in this case are not in dispute. Bell & Beckwith, the Debtor, was a stock brokerage located in Toledo, Ohio. The movant in this action is the Trustee for the liquidation of Bell & Beckwith pursuant to the provisions of 15 U.S.C. § 78aaa *et seq.* The Objector is the Security Investor Protection Corporation (hereinafter "SIPC"), a nonprofit membership corporation created by the Securities Investor Protection Act (hereinafter "SIPA"). SIPC administers a fund, financed by membership assessments, which insures that customers of insolvent broker-dealers receive the protection provided for in the SIPA. Having reimbursed Bell & Beckwith's customers as provided for in the SIPA, SIPC is now the Debtor's largest creditor pursuant to its right of subrogation.

This settlement concerns claims involving Zula Wolfram, former wife of Bell & Beckwith's managing partner, Edward F. "Ted" Wolfram, Jr. (hereinafter "Mr. Wolfram"). Beginning approximately Ten (10) years prior to the initiation of this liquidation proceeding, Mr. Wolfram began systematically and fraudulently diverting cash and securities, held by the brokerage in customer margin accounts, into accounts which he controlled. Many of these accounts were held in Zula Wolfram's name. At the time Mr. Wolfram's fraud was discovered by a Securities & Exchange Commission examiner in February of 1983, Mr. Wolfram had stolen approximately Forty-six Million Dollars ($46,000,000.00).

On February 6, 1983, a few days after Mr. Wolfram's fraud was discovered, both Mr. Wolfram and Zula Wolfram signed a blanket assignment of all of their property to the Debtor. The District Court granted SIPC's application for the appointment of a Trustee on February 10, 1983, and selected Patrick A. McGraw to serve in that capacity. On February 16, 1983, Zula Wolfram and her husband signed a second assignment, modeled on the first, which assigns, *inter alia,* "any and all real and personal (tangible and intangible) property that the Wolframs and Wolfram entities, individually and jointly, now or hereafter own or acquire and all interests in such property that they now own or hereafter acquire to secure repayment of the margin accounts and their performance of this Assignment. The property covered by this paragraph includes any and all property of the Wolframs and Wolfram entities, including without limitation claims, choses in action, and partnership interest."

At the time this case was filed, on February 5, 1983, there were a number of customer accounts at Bell & Beckwith which were held in Zula Wolfram's name. Those customer accounts had a *debit* balance of approximately Twenty-four Million Dollars ($24,000,000.00). The Trustee filed a Complaint seeking to recover the amount owed on the accounts. Because Zula Wolfram requested a trial by jury, the case was transferred to the District Court where it was assigned to the Honorable John W. Potter, United States District Judge. Zula Wolfram has contested her liability on the debit balance existing in accounts maintained in her name. She has denied that she maintained sufficient control over the accounts to be charged with responsibility for the amounts owed on those accounts.

Subsequent to the execution of the assignments, some of the securities declared dividends and paid interest. The dividends and interests were received by Zula Wolfram, who refused to turn these assets over to the Trustee, despite her assignment of the underlying securities. On March 13, 1984, the Trustee filed a Complaint against Zula Wolfram in this Court, seeking to recover dividends and interest payments in excess of Thirty-six Thousand Dollars ($36,-000.00). A jury trial was also demanded in this case, which was transferred to the District Court and consolidated with the Trustee's action on the customer accounts.

The Wolfram assignments covered not only property that was acquired after the fraud began, they also include so called "pre-fraud" assets. It appears that the Wolframs' home was purchased prior to 1973, as were a number of other less valuable assets. Zula Wolfram contends that she was not advised that the distinction between pre-fraud and post-fraud assets could affect the Trustee's entitlement to those assets.

One of the major issues in this litigation is the extent to which Zula Wolfram was represented by counsel. Attorney Frank McManus was the Wolfram's family attorney prior to the collapse of Bell & Beckwith. He was a childhood friend of Mr. Wolfram's, and while the brokerage was open, had lunch with Mr. Wolfram frequently. Mr. McManus's relationship with Zula Wolfram was also a close one. For example, Zula Wolfram testified that Frank McManus was her godparent. After Mr. Wolfram's fraud was discovered, William Connelly was retained to handle Mr. Wolfram's defense. Mr. Connelly testified that Mr. Wolfram was his "primary client". However, SIPC introduced a letter, signed by Mr. Connelly, indicating that he would retain certain funds for legal services "on behalf of Mr. and Mrs. Wolfram".

Counsel for Zula Wolfram has argued that there was a clear conflict of interest to the extent that Mr. McManus and Mr. Connelly attempted to represent both Zula and Edward Wolfram. It would appear from the facts in this case that the dual representation was far from ideal. It is less clear that the facts in this case amount to the absence of representation. It should be noted that Mr. McManus continued to represent Zula Wolfram on the tax problems arising from her signing joint tax returns which had failed to include the income Mr. Wolfram procured by fraud. Zula Wolfram testified that she is satisfied with Mr. McManus's representation of her interests in the tax case, which is currently on appeal in the Ninth Circuit.

In the Trustee's suit to recover the dividends and interest, Zula Wolfram filed an answer and counterclaim, and later an amended answer and counterclaim. Among the affirmative defenses asserted by counsel for Zula Wolfram are: lack of consideration to support the assignment; failure of consideration; that the assignments were the result of duress, undue influence, or both; that Zula Wolfram was incompetent at the time the assignments were executed; unconscionability of the assignments; and her lack of capacity to enter into the assignments. In her counterclaim, Zula Wolfram restates her defenses as affirmative causes of action against the Trustee. In addition to seeking damages in the amount of Twenty-four Million Dollars ($24,000,000.00), Zula Wolfram also moved for an Order declaring the two assignments of property to the Trustee to be null and void.

The Trustee moved for summary judgment on all issues before the District Court, and Zula Wolfram moved for partial summary judgment on the issue of lack of consideration. The District Court denied Zula Wolfram's motion, holding that the defenses raised concerning the failure of consideration were without merit. The Trustee's motion for summary judgment was denied because there were issues of material fact as to whether Zula Wolfram acted under duress and/or undue influence. The District Court also noted that Zula Wolfram's alleged incompetence and lack of capacity to contract, and the Trustee's ratification theory, were jury questions. *See, Plaintiff's Exhibit 10, Patrick A. McGraw, Trustee v. Zula Wolfram, slip op.* C 85–7659 (N.D.Ohio July 23, 1985).

After Judge Potter denied both motions for summary judgment, the parties engaged in discovery and settlement negotiations. Discovery included the psychiatric examination of Zula Wolfram by Andrew S. Watson, M.D., an expert retained by the Trustee. He evaluated the mental competency of Zula Wolfram at the time she signed the assignments of property. Dr. Watson's expert opinion was not favorable to the estate's actions in the District Court. The testimony presented to the Court by Dr. Watson indicated that it was his expert opinion that Zula Wolfram could not focus her attention for some time after the shock of Mr. Wolfram's confession to the family that he had been a thief. Of course, other traumatic events and pressures also followed after the collapse of Bell & Beckwith. Basically, Dr. Watson stated that Zula Wolfram was in shock.

Dr. Watson's opinion was based upon a standard psychiatric evaluation, lasting approximately two hours and thirty minutes, which was done on July 17, 1986. During that examination, Dr. Watson took Zula Wolfram's history, interviewed her, and asked probing questions based upon her responses. The testimony included very general allusions to certain traumatic childhood events which were not detailed to the Court, but which would presumably be part of Dr. Watson's testimony if these actions were to continue on to a jury trial.

The two attorneys who represented Mr. Wolfram, and whose representation of Zula Wolfram is disputed, testified concerning their recollection of her behavior at the time the assignments were made. Also testifying were the Trustee, and an attorney for the Trustee who had been involved in negotiations early in the Bell & Beckwith case. The witnesses who had actually interacted with Zula Wolfram were asked the same two questions by the counsel for SIPC. They were asked: "did she appear lucid?" and "did she appear rational?". All the witnesses, except Mr. Connelly, answered affirmatively. Mr. Connelly responded, "I don't think she was in great shape". It should also be noted, none of the above mentioned witnesses could relate any instance of Zula Wolfram being put under duress.

Zula Wolfram testified that, upon reflection, she felt that she had been unfairly pressured into signing the assignments by her husband's attorneys. She recalled feeling withdrawn, after the discovery of her husband's fraud, and drinking heavily. Zula Wolfram also stated that no one explained the options and ramifications associated with the assignments of property.

The settlement before the Court involves the following elements: 1) the execution by the parties of mutual releases; 2) dismissal of the Trustee's action and Zula Wolfram's countersuit; 3) delivery by Zula Wolfram of a ratification of the assignment and property transfers she has previously made to Bell & Beckwith and the Trustee; 4) withdrawal by Zula Wolfram of all proofs of claim filed by her or filed on her behalf; 5) release by Zula Wolfram of any claims by her against proceeds from the sale of certain Wolfram paintings and real estate, and against monies received by the Trustee from Charles and Mary McKenney and related entities; 6) transfer by Zula Wolfram to the Trustee of her interest in a Christmas tree farm; 7) payment by the Trustee to Zula Wolfram of Fifty-nine Thousand, Four Hundred Ninety-six Dollars and Sixty-five Cents ($59,496.65), this being the net value of the prefraud property previously transferred by Zula Wolfram to the Trustee, minus the amount owed the Trustee for the post-petition interest and dividends;[1] 8) representations by Zula Wol-

---

1. "Net value" of the pre-fraud property consists of: (1) Zula Wolfram's one-half share of the gross proceeds from the sale of the Wolfram home, which was purchased prior to the initiation of the fraud, minus closing costs and maintenance expenses incurred upon sale of that property ($67,055.60); plus (2) proceeds from the auction by the Trustee of certain jewelry and art which Zula Wolfram has identified as being purchased by her before the time when the fraud began (*i.e.,* pre–1973), minus action expenses ($15,050.00); plus (3) certain pre-fraud securities held in Zula Wolfram's name ($2,440.00); plus (4) the value of a painting purchased prior to the fraud which was sold other than at auction ($3,352.50); plus (5) maintenance expenses incurred by the Trustee which would not have been incurred if the Wolfram

fram that she had no knowledge prior to February 5, 1983 of the fraud, she has no knowledge of the existence or location of any proceeds of the fraud, and that the items listed as comprising the value of her prefraud property were in fact acquired by her prior to the time when the fraud began. In addition, in exchange for Zula Wolfram agreeing to entering into this settlement, the Trustee has agreed to offer to sell the Christmas tree farm to Zula Wolfram's son, and to release any claim by the Trustee to Three Thousand Five Hundred Eighty-nine Dollars and Seventy-two Cents ($3,589.72) currently being held by Flower Hospital, against which the Trustee had asserted a claim as a preferential payment.

## LAW

This proposed settlement comes before the Court pursuant to Bankruptcy Rule 9019(a), which states:

> (a) Compromise. On motion by the trustee and after a hearing on notice to creditors, the debtor and indenture trustees as provided in Rule 2002(a) and to such other persons as the court may designate, the court may approve a compromise or settlement.

■ The decision whether to approve a trustee's proposed settlement is a matter within the sound discretion of the Bankruptcy Court. *In re Bell & Beckwith*, 87 B.R. 472, 474 (N.D.Ohio 1987); *In re Mobile Air Drilling Co., Inc.*, 53 B.R. 605, 607 (Bankr.N.D.Ohio 1985). In deciding whether to approve a proposed settlement, the Court must determine whether the settlement is in the best interest of the estate. *In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D.Pa.1986); *In re Mobile Air Drilling Co., Inc., supra*, 53 B.R. at 607.

■ In evaluating a proposed settlement agreement, the Bankruptcy Court should consider the probability of success in litigation, the difficulties, if any, to be encountered in collecting any judgments that might be rendered, the complexity of the litigation involved, as well as the expense, inconvenience and delay necessarily attendant to the litigation, and the paramount interests of creditors with proper deference to their reasonable views. *In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir.1986); *In re Technology for Energy Corp.*, 56 B.R. 307, 311 (Bankr.E.D.Tenn. 1985); *In re Hermitage Inn, Inc.*, 66 B.R. 71, 72 (Bankr.D.Colo.1986); *Matter of Carla Leather, Inc.*, 44 B.R. 457, 466 (Bankr.S. D.N.Y.1984), aff'd, *In re Carla Leather, Inc.*, 50 B.R. 764 (S.D.N.Y.1985); *Drexel v. Loomis*, 35 F.2d 800, 806 (8th Cir.1929). The Court may give weight to the opinions of the Trustee, the parties and their counsel, in determining the reasonableness of the proposed settlement. *In re Heissinger Resources Ltd.*, 67 B.R. 378, 383 (C.D.Ill. 1986). While creditors' Objections to a settlement agreement must be afforded due deference, such Objections are not controlling. *In re A & C Properties, supra* 784 F.2d at 1382; *In re Mobile Air Drilling Co. Inc., supra* 53 B.R. at 607.

■ The Trustee, as proponent of the proposed settlement, has the burden of persuasion that the settlement is in the best interest of the estate. *In re Hermitage Inn, Inc., supra* 66 B.R. at 72; *In re GHR Companies, Inc.*, 50 B.R. 925, 931 (Bankr. D.Mass.1985). In determining whether to approve the Trustee's proposed settlement, the Court does not substitute its judgment for that of the Trustee. *In re Neshaminy Office Bldg. Assoc., supra* 62 B.R. at 803; *Matter of Carla Leather, Inc., supra* 44 B.R. at 465. Instead, the Court will, at the Hearing on the proposed settlement, "canvass" the issues and see if the settlement falls below the lowest point in the range of reasonableness. *In re Technology for Energy Corp., supra* 56 B.R. at 311. The purpose of the Hearing is not for the Court to decide the numerous issues of law and fact raised by the Objectors. *Id.* What is

---

house had been occupied by Zula Wolfram ($8,349.59); minus (6) the value of the dividends received by Zula Wolfram after the bankruptcy petition for Bell & Beckwith had been filed, this amount being the sum for which recovery was sought in the Trustee's lawsuit against Zula Wolfram ($36,751.04). The calculation of the $59,496.65 payment to Zula Wolfram is set forth in Exhibit 8 to the Settlement Agreement.

being sought is not the resolution of issues, but rather the identification and clarification of the litigation issues so that the Court can make an informed decision on the reasonableness of the settlement. *Matter of Carla Leather, Inc., supra* 44 B.R. at 470; *In re Hermitage Inn, Inc., supra* 66 B.R. at 72.

Finally, the Court bears in mind the first sentence of *In re Heissinger Resources Ltd.,* "The law favors compromise." 67 B.R. 378, 379. *See also, In re A & C Properties, supra* 784 F.2d at 1381.

■ The Court will consider SIPC's Objections within the traditional framework for approval or rejection of settlements. Both parties have agreed that four factors are relevant to this matter.

## COMPLEXITY OF THE PROSPECTIVE LITIGATION

SIPC argues that the litigation before the District Court is not overly complex. There is no dispute as to the facts surrounding Zula Wolfram's receipt of the dividends and interest from securities which she had previously assigned to the Debtor and the Trustee. In SIPC's opinion, the Trustee's other lawsuit, for the Twenty-four Million Dollar ($24,000,000.00) debit balance on accounts held in Zula Wolfram's name, also involves fairly simple issues of law.

SIPC admits that the counterclaims are more troublesome. However, SIPC asserts that the District Court's Opinion eliminated many of the purely "legal" defenses which Zula Wolfram has interposed in opposition to the Trustee's Complaint. In SIPC's view, what remains are predominately factual issues concerning duress, unde influence, and Zula Wolfram's legal competence at the time she entered into the assignments.

The Trustee assesses the litigation's complexity somewhat differently. While the Trustee agrees that receipt and retention of the dividends is not disputed, it would be the burden of the Trustee to prove execution of the assignment and the application of a constructive trust to the securities underlying the dividends and interest. It is argued that this constructive trust element injects a measure of complexity into the case. The Trustee quotes this Court's decision in *In re Bell & Beckwith,* 64 B.R. 620 (Bankr.N.D.Ohio 1986), which states that to carry the burden of proof, for imposition of a constructive trust, "it would be necessary for the Trustee to demonstrate, with specificity and clarity, each of the transactions which are alleged to have taken place". *Id.* at 635. Thus, the proof would require extensive investigation, and analysis of Bell & Beckwith's records, and detailed testimony by the Trustee's accountants. The Trustee contends that for a jury, such a presentation would qualify as "complex".

The Trustee also urges the Court to consider the complexity of the Trustee's rebuttal of Zula Wolfram's counterclaim. It is expected that Zula Wolfram's case in chief would consist of evidence of duress, undue influence, incapacity and incompetence. In response, the Trustee would assert, on rebuttal, that even if the assignments are not binding, Zula Wolfram is not entitled to any of the assets she seeks because they were all purchased with stolen funds, and are therefore property of the Bell & Beckwith estate by virtue of a constructive trust. It should be remembered that in addition to such large assets as a casino, unimproved real property and race horses, there are a number of household goods which were sold at auction. Under the standard set forth above, proving that a constructive trust should be placed over those items would be difficult.

It is the view of the Court that the Trustee's case should be considered complex. Obviously, the term "complex" is a relative term that moves along a sliding scale. However, the volume and detail of the evidence required to prove the Trustee's constructive trust theories, and the practical problems associated with making a presentation of these facts interesting to a jury, lead the Court to conclude that this factor weighs in favor of settlement.

## THE PROBABILITY OF SUCCESS

SIPC believes that the Trustee will prove all of the prima facie elements of the es-

tate's action to recover the dividends and interest. Thereafter, Zula Wolfram will bear the burden of proof on her counterclaims which seek to void the disputed assignments. SIPC cites Ohio cases for the proposition that the party asserting the invalidity of a written instrument because of incompetence, must prove the incompetence by clear and convincing evidence. *See, Willis v. Baker,* 75 Ohio St. 291, 79 N.E. 466 (1906); *Di Pietro v. Di Pietro,* 10 Ohio App.3d 44, 460 N.E.2d 657 (1983). Further, the other affirmative defenses of fraud, undue influence, and duress would also require Zula Wolfram to carry the burden of proof. *See, Willis v. Baker, supra; Laymon v. Bennett,* 75 Ohio App. 233, 61 N.E.2d 624 (Ohio Ct.App.1944). Moreover, SIPC contends that even if Zula Wolfram could prove some impairment of her faculties, this would not, in and of itself, be sufficient to void the assignments. SIPC contends that if Zula Wolfram had sufficient mental capacity to comprehend the nature of the transaction, it would be binding. *See generally, Thomason v. Smith,* 103 F.2d 936, 945 (D.C.Cir.1939).

In summary, it is SIPC's assertion that the Trustee is able, with virtual certainty, to prove his case in chief, and has a very high probability of defeating the affirmative defenses and counterclaims raised by Zula Wolfram.

The Trustee's view of the likelihood of success is based on a number of factors which were not explicitly included in SIPC's analysis. The major difference in the projected result, in the Trustee's assessment, is the probability of defeating the counterclaims raised by Zula Wolfram. Given the stressful circumstances surrounding Zula Wolfram's execution of the original assignments, the Trustee believes that the probability of success in defeating Zula Wolfram's claims and affirmative defenses is Fifty percent (50%), or less. This estimate does not include the Trustee's probability of success in establishing a constructive trust, or ratification of the assignments.

The Trustee's estimation of his likelihood of success is lower because of the follow-ing perceived difficulties. First, there is always a greater degree of uncertainty associated with trial before a jury. This uncertainty is increased when the evidence and arguments to be presented are detailed and tedious. Zula Wolfram's description of the events surrounding the collapse of Bell & Beckwith will be more interesting to a jury than the testimony of the Trustee's accountants. Additionally, the testimony of Dr. Watson does not support the Trustee's position that Zula Wolfram was competent when she executed the assignments. Dr. Watson's opinion as to Zula Wolfram's condition in 1983 may not be sufficient to prove incapacity under the state law standard. However, in a jury trial, the precise legal standard is often less important than when the trial is to the court. In this case, Dr. Watson has impressive credentials and is a very good witness. He paints a sympathetic picture of Zula Wolfram in the days after the collapse of the brokerage. Also notable, is the fact that Dr. Watson was hired by the Trustee. While its efficacy may be questioned, one of the most common methods of attacking the credibility of expert testimony is asking the expert if he or she was paid for the work associated with forming an opinion and testifying. In that respect, the Trustee will have a difficult time effectively cross-examining an expert which he hired.

The parties differ on how a jury will view Zula Wolfram. On the one hand, she lived very well, even extravagantly, before her former husband's fraud was discovered. Her lifestyle was supported almost entirely by stolen money. SIPC quoted the following passage from Judge Joan Seitz Pate's memorandum decision on Zula Wolfram's tax case:

We start with the premise that Ted's reported income would have supported a rather high standard of living. His partnership income from Bell & Beckwith alone was much higher than "usual" or "average" among taxpayers and even without his defalcations would have supported a fine home, numerous automobiles, luxurious vacations and a country club membership. But, Ted and Zula's lifestyle was a far cry from this type of

upper middle class existence. In addition to the above listed accoutrements, they owned an expensive horse ranch in Florida, an extensive cattle ranch in the midwest, a hotel and gambling casino in Las Vegas and numerous exotic automobiles. This enabled Zula to hobnob with the aristocrats of the "horsey" set as well as stars of the entertainment world, even those who did not shirk from asking her for subtantial loans. To top it all off, Zula and Ted owned their own jet airplane so they could fly to and from these various locations in style. This lifestyle was more than well-to-do; it can only be characterized as opulent, lavish, and extravagant.

*Edward P. Wolfram, Jr. and Zula J. Wolfram v. Commissioner*, 54 T.C.M. 266, 270–271 [CCH Dec. 44,143(M) ] (1987).

On the other hand, from the inception of the Bankruptcy case, there has never been any assertion by the Trustee, or anyone else, that Zula Wolfram had any knowledge of the fraud. It has been noted, in many different contexts, that the fraud was not discovered by the numerous routine investigations and audits during the years Mr. Wolfram was stealing investor funds. Accordingly, it is entirely possible that a jury would view Zula Wolfram as a sympathetic figure in this litigation. The collapse of Bell & Beckwith resulted in a great deal of stress and anxiety for Zula Wolfram, but at the time the assignments were made, most of her attention, and that of the lawyers, was directed toward Mr. Wolfram's legal problems. There is no disputing the view that it would have been better if she had had independent legal counsel to look after her interests, and to advise her of her options. When these facts are examined in combination with the testimony of Dr. Watson, and the undisclosed elements that are part of his diagnosis, it must be concluded that a jury trial carries some significant risks for the estate.

This brings us to the second element of the Trustee's argument. The Trustee believes the proposed settlement accurately reflects, with a high degree of probability, where the parties would end up at the end of a trial. Under the Trustee's analysis, he will probably prove his claim for the dividends. Zula Wolfram will probably prevail on her claim and affirmative defense of incapacity, affecting the Trustee's entitlement to any pre-fraud assets. The Trustee will then probably prevail on the application of a constructive trust claims as to assets acquired by Zula Wolfram and her husband after the fraud began in 1973. There are some "pre-fraud assets", the largest being the Wolfram family home, for which the Trustee will probably be unable to muster sufficient proof for a constructive trust to be applied. Thus, there is no allocation in the settlement for return of any post-fraud assets. Accordingly, the Trustee argues that the settlement reflects the probable results of the litigation.

SIPC disagrees with the Trustee's assessment of the settlement. It is SIPC's contention that the settlement only reflects the Trustee's litigation risk, and not Zula Wolfram's risks. SIPC cites the Tax Court decision as evidence that Zula Wolfram faces significant litigation risks in proving her affirmative defenses. In *Edward P. Wolfram and Zula J. Wolfram v. Commissioner, supra*, the Tax Court rejected Zula Wolfram's defense that she was an "innocent spouse" with respect to her failure to pay taxes on funds stolen by her husband. However, it should be noted that the Tax Court case was based on Zula Wolfram's conduct before Bell & Beckwith's demise. It is Zula Wolfram's position, and that of the Trustee's expert witness, that Zula Wolfram was severly affected by those events. Moreover, the legal requirements for relieving a spouse, who signed a joint tax return, from liability are much different than the provisions for proving Zula Wolfram's affirmative defenses.

SIPC's other objection is based upon the Trustee's choice of items to credit and debit. SIPC maintains that the Trustee is giving Zula Wolfram all of the pre-fraud assets, without a corresponding reduction for benefits which she received. Specifically, there is no credit to the Trustee for the fact that Zula Wolfram was supported for years, in a lavish fashion, with funds stolen

from the Debtor. SIPC also objects that no credit will go to the estate based on the fact that the so called "Christmas Tree Farm" should have been immediately transferred to the Trustee pursuant to the terms of the two assignments.

During the Hearing on this matter, it became apparent that additional factors played a part in the settlement. First, it is evident that the Trustee believes that the assignments are very important to the estate and its administration. Without the assignments, the very quality of the title the Trustee can convey will be in question, at least until the constructive trust litigation, including appeals, is completed. The second factor which became apparent at the Hearing was the lack of an "upside" for the estate.

At this time, Zula Wolfram is essentially uncollectable. She works as a cashier at a Las Vegas casino, and although her tax case is on appeal, she is currently subject to a Four Million Dollar ($4,000,000.00) tax obligation. Thus, the possibility of a Twenty-four Million Dollar ($24,000,000.00) judgment would have little real affect on Zula Wolfram's circumstances. There seems to be reason to conclude that Zula Wolfram's litigation risk was not fully included in the settlement because of her "bulletproof" status at this time. The Court notes that settlements are not always creatures subject to precise mathematical analysis. Often, the result has been reached after negotiations which are controlled by the litigant's perception of their overall positions, rather than by the consideration of a series of individual elements.

Finally, SIPC has raised the issue of Zula Wolfram's present capacity to enter into this settlement agreement. Their question is: What is to prevent her from coming back with the same type of lawsuit at some time in the future? Initially, it is readily apparent that the traumatic events in this case are now five years old. The view that "time heals all wounds" is in keeping with Dr. Watson's testimony that Zula Wolfram is today able to comprehend the settlement with the Trustee. The Trustee recalled Zula Wolfram to the stand, and questioned her about her understanding of the terms of the settlement. In her answers, Zula Wolfram demonstrated a satisfactory grasp of the meaning of the proposed compromise. Another fact which strengthens the binding effect of the settlement is Zula Wolfram's representation by counsel in the negotiation of this compromise. Her current attorney represents Zula Wolfram, and only Zula Wolfram in this matter. Zula Wolfram testified, under oath, that she now feels she has counsel. Under these circumstances, the Court believes that the settlement will stand, if approved.

Therefore, the Court having "canvassed" the various arguments put forth by the parties, it appears that the probability of success portion of the test also favors the settlement.

## THE DELAY AND EXPENSE OF LITIGATION

SIPC does not believe that trial preparation and trial of this action will require additional expenditures such as to make this case economically unfeasible to bring to trial. Moreover, SIPC notes that its view on this matter should be particularly persuasive because SIPC, and only SIPC, will suffer by virtue of an increase in administrative expenses. Under 15 U.S.C. § 78fff–3(b)(2), SIPC will be required to advance the funds necessary to pay the administrative expenses attendant to the litigation. This argument will be addressed more fully in the next section.

The Trustee asserts that taking this case to trial will be expensive and time consuming. As previously discussed, the Trustee contends that a great deal of testimony, and other evidence, would be required to prove the constructive trust theory. There are a large number of items for which proof would be required. Testimony of the Trustee's accountants would be necessary, as would a thorough review of the records related to Mr. Wolfram's fraud and the purchase of the relevant items of property. The trial would be before a jury, meaning that evidentiary issues could play a larger part in the proceeding. Again, the Trustee also notes the low possibility of any recovery in excess of the value of the dividends

and interest which Zula Wolfram failed to turn over to the Trustee.

If this proposed settlement is rejected, it will take some time before the parties will be ready to go to trial. The case will have to be scheduled by the District Court, and there is always the possibility of an appeal being filed. Of course, approval of this settlement is also subject to appeal. On the whole, it appears that approval of the settlement should conclude this matter more swiftly than a trial on the merits. On the other hand, SIPC's point is well taken as to the expense issue. It will be their expense to bear. Each side has shown that one element supports their position, and the Court finds this factor to be equipoised between the parties.

## THE PARAMOUNT VIEWS OF CREDITORS

If this were the typical settlement case, with the creditor exhorting the Trustee "let's you and them litigate", the Court's decision would be an easy one. The settlement would have been approved without this extensive discussion. However, SIPC has argued that its views are entitled to greater weight than the usual creditor.

The fact that SIPC is the largest creditor of Bell & Beckwith is not disputed. Over Ninety percent (90%) of Bell & Beckwith's debt is owed to SIPC. SIPC has paid out over Thirty-nine Million Dollars ($39,000,-000.00) to former customers, and for the expenses of administering the estate. Most importantly, the cost of this litigation, if it were to go forward, would be borne by SIPC, and only SIPC. In support of its assertion that these factors give greater weight to its Objections, SIPC cites two cases, *Matter of Marshall*, 33 B.R. 42 (Bankr.D.Conn.1983) and *In re Wells*, 26 B.R. 150 (Bankr.D.R.I.1983).

In the *Marshall* case, the bankruptcy court rejected the trustee's proposed settlement of a controversy over property claimed by the debtor as exempt. The litigation which the trustee sought to settle concerned the assertion that an employment contract was actually a disguised allocation of a part of the purchase price for a radio station in which the debtor had an interest. The objecting creditor represented over Ninety percent (90%) of the unsecured claims, and had offered to cover the costs of litigation. The court rejected the trustee's application to compromise, finding that under the circumstances, "a proper deference" to the reasonable views of creditors outweighed the recommendation of the trustee. *See, Matter of Marshall, supra,* at 45.

The *Wells* decision also held that the trustee's proposed compromise should be rejected. The trustee petitioned for authorization to accept a Ten Thousand Dollar ($10,000.00) settlement offer in a state court action brought to determine the debtor's interest in real property owned by the debtor's wife at the time of her death. The objecting creditor's claim constituted Eighty percent (80%) of all allowed claims in the case, and the creditor had agreed to advance costs to continue the state court action. In rejecting the settlement, the court stated:

> The objecting creditor's claim in the amount of $24,321.07 constitutes 80 percent of all allowed claim. Not only does the objecting creditor represent 80 percent of the interest of all creditors, but he has agreed to advance the costs to continue the state court action. In these circumstances, the Court gives deference to [the creditor's] position in determining whether to approve the proposed settlement, since we are talking almost exclusively about his money.

*In re Wells, supra,* at 152 (footnote omitted).

While this Court agrees with the general rule set forth in *Marshall* and *Wells*, the present case appears to be distinguishable. Both cases deal with fairly straightforward suits for money or property. The case before the Court is complicated by the presence of the assignment issues. Here, the worse case scenario is not simply an economic loss to creditors, it is a complete unraveling of the estate an estate which is shortly to enter into its sixth year. The quality of the Trustee's title depends on the assignments. Without the assignments, all past sales of property may be called into

question. Administrative problems would increase substantially. Problems in which the Trustee, and the Court, have spent considerable time resolving, could reappear, like the ghost of Banquo. If the jury verdict were unfavorable, the litigation could virtually halt the liquidation of the estate pending appeal. The Court bears in mind that this is not the likely result of the litigation. It is, however, a possible result.

Accordingly, the Trustee's recommendation that the estate eliminate this risk, through settlement, does not fall below the lowest point in the range of reasonableness. Further, after reviewing this matter thoroughly, the Court is inclined to Overrule SIPC's Objection, and Allow the Settlement, as it appears to be in the best interest of the estate.

In reaching these conclusions, the Court has considered all the evidence and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Wherefore, it is

ORDERED that SIPC's Objection be, and is hereby, OVERRULED.

It is FURTHER ORDERED that the proposed settlement be, and is hereby, APPROVED.